CHARLES McSORLEY AND ELLEN McSORLEY V. ALICE S. HILL, *Executrix of the Last Will and Testament of William C. Hill, Deceased.*

PUBLIC LANDS — DONATION CLAIMS — DIVORCE — REGISTER'S CERTIFI-CATE — VESTED RIGHTS — INNOCENT PURCHASER — PORTERFIELD WARRANTS — LOCATION — ASSIGNMENT.

Where a married man became a resident of the Territory of Oregon prior to December 1, 1850, and settled on 640 acres of land in April, 1852, claiming same under the act of congress, Sept. 27, 1850 (9 U. S. St. at Large, ch. 76, p. 497), his divorce in December, 1852, reduces his rights under said act to those of a single man, and his subsequent marriage in 1853 will not put him in a position to claim more than 320 acres.

Section 5 of the act of February 14, 1853 (10 U. S. St. at Large, 153), amendatory of the act of September 27, 1850, merely extends the time within which persons may acquire title under the donation act, and does not change the qualifications of the applicant there-under.

The fact that the register of the local land office issued a certificate to a man and his wife entitling them to 640 acres under the donation law, gives them no vested right in said land where the commissioner of the general land office, under the discretion vested in him by § 7 of said act, reverses the action of the local officers.

Where such parties, having no vested rights in the land, and be-fore the issue to them of a donation certificate therefor, convey said land to another, their grantee cannot be considered an innocent purchaser for value.

Under the act of congress, April 11, 1860, for the "relief of the legal representatives of Charles Porterfield, deceased," Porterfield warrants may be located upon lands which are occupied under an invalid entry.

The act of congress, March 22, 1852, § 1, providing "that all war-rants for military bounty lands which have been or may hereafter be issued under any law of the United States, are hereby declared assignable," applies to the Porterfield warrants.

Where rights have been acquired under the construction of the executive department allowing Porterfield warrants to be located upon unoffered land, such rights will not be disturbed when it does

not clearly appear from the act of congress that it contemplated restricting such locations to lands that were subject to private entry.

## *Appeal from Superior Court, King County.*

Action by Alice S. Hill, executrix of William C. Hill, against Charles and Ellen McSorley, for possession of real estate.

In April, 1852, one D. S. Maynard, under the act of September 27, 1850, commonly known as the "Oregon donation law," made settlement upon a tract of 640 acres of land in King county, as a donation claim. Maynard had taken up his residence in Oregon in September, 1850, and in April, 1853, he filed in the office of the register and receiver at Olympia his notification No. 407, claiming this 640 acres of land as a donation claim, one-half for himself and one-half for his wife, Catherine T. Maynard; continued his residence upon the land; complied with the law in respect to cultivation; and made his proof as required by the act. After his term of residence was completed, but before the land office had issued any certificate to him for the land, in 1867, Maynard and his wife, Catherine T., executed a deed of the land in dispute, for a valuable consideration, to Hugh McAleer. In 1869, two years after this deed was recorded, and after McAleer had taken possession of the land, the local land office issued a certificate, as provided by § 7 of the donation act, to David S. Maynard and Catherine T., for the tract of land in question, the west half to the husband and the east half to the wife. The east half embraces all the land now in litigation. In 1871 the general land office reversed the action of the local land office in giving the east half to Catherine T., and found that it belonged to a former wife of D. S. Maynard, Lydia A., whom he married in 1828, and from whom he was divorced on the 24th day of December, 1852, by the legislature of Oregon. On the 15th day of January,

1853, he was married to Catherine T. The secretary of the interior, upon appeal, rejected the claim of both wives, and ordered the patent for the west half to issue to Maynard as a single man, which was done. Between the year 1875, when this final action was taken by the department, and the year 1880, divers claims were made to this land, none of which were held valid by the department. On the 8th day of January, 1880, W. C. Hill, party to these suits, and one J. Vance Lewis, made application at the local land office to locate Porterfield warrants upon this land, which application was rejected, but upon appeal was allowed. Eleven months after this application, viz., on December 16, 1880, Hugh McAleer, having lived since 1867 upon the land, offered a homestead application, which was rejected by the local land officers, whose action, upon appeal, was sustained. McAleer, however, had made a prior homestead application on April 1, 1880, which was rejected by the local land office, and from which no appeal was taken. McAleer, so far as the proof shows, was a foreigner, having never completed his naturalization. Certain of the heirs of Hugh McAleer are in possession of a portion of this land. Lewis' and Hill's entries under the Porterfield warrants were allowed, and patents duly issued to them. Lewis and wife conveyed their interest to Hill, who holds the legal title to the land, and brings suit against McSorley and other heirs of McAleer for possession. The defendants set up McAleer's rights under the deed from Maynard, and his homestead application, and also bring an action to declare Hill a trustee for McAleer. In the ejectment suit they also attack the validity of Hill's patent, because they say the Porterfield warrants are not properly located, and therefore the patent is void. Both causes proceeded to trial by the court, and were heard together. In the first action, the ejectment suit, a judgment was awarded plaintiff for possession of the land, and a writ of possession

directed. The second action was by the lower court dismissed, with a judgment for defendant for his costs. Mr. Hill died, and both these suits are continued in the name of Alice S. Hill as executrix.

*Jacobs & Jenner,* and *W. R. Andrews,* for appellants.
*Junius Rochester,* for appellee.

The opinion of the court was delivered by

DUNBAR, J.—The first question here is, did the deed from Maynard and wife to McAleer convey title to the land in question, or did Maynard and wife have any interest or right in said land which could by them be conveyed? Sec. 4 of the donation act of 1850 (9 U. S. St. at Large, 497) granted to every white settler of the public lands (with the necessary qualifications of age and citzenship), who was then a resident of the Territory of Oregon, or should become a resident therein on or before the 1st day of December, 1850, the quantity of one-half section or 320 acres of land for a single man, and for a married man, or if he should become married within one year from the 1st day of December, 1850, the quantity of one section, or 640 acres of land, one-half to himself and the other half to his wife, to be held by her in her own right; and provided that the surveyor-general should designate the part inuring to the husband and that to the wife. Maynard became a resident of Oregon prior to the 1st day of December, 1850, and was also a married man, being the husband of Lydia A. This relation was still continuing in April, 1852, when he made his settlement on a donation claim, and he and his wife were entitled to 640 acres, one-half to inure to him, and the other to his wife, Lydia A. But about the middle of December, 1852, he was divorced from Lydia A. On January 15, 1853, he was married to Catherine T. By this act of divorcement, the claim of Lydia A. to one-half

of the land became annulled, and Maynard became a single man. It would be a novel mode of administering the law to allow a man to escape marital responsibility by divorcing his wife, and still allow him benefits that attach exclusively by reason of his relation as a husband. Thirty days elapsed between the time he was divorced from Lydia A. until he was married to Catherine T. During these thirty days he was a single man, and it cannot be contended that he would have been entitled under § 4 to have claimed the provision giving to married men 640 acres each. After he became a married man again, and commenced the settlement with Catherine T., the law only allowed him, by reason of his marriage relations, 320 acres. The new wife should certainly not be allowed, either in morals or in law, to claim any rights through the wife whom she had supplanted. This provision of the law was made for the benefit of women who married prior to December 1, 1851. Catherine T. was not married prior to that date, and she must claim through her own marriage, and not the marriage of Lydia A. Maynard, by his own volition, destroyed the relationship which entitled him to 640 acres, and, so far as Maynard's interest is concerned, the extra 320 acres which a married man could take was not intended as a personal right attaching to or prerogative of the husband, which he could take from one wife by divorcement, and confer upon another; and he was not placed in any different position with reference to it by his marriage in 1853. This doctrine is substantially announced by the supreme court in *Maynard v. Hill*, 125 U. S. 216 (8 Sup. Ct. Rep. 723), where the court, in reference to the standing of this identical land, says:

"When, therefore, the act was passed divorcing the husband and wife, he had no vested interest in the land, and she could have no interest greater than his. . . . A divorce ends all rights not previously vested. Interests

which might vest in time, upon a continuance of the marriage relation, were gone."

There was only one way by which Catherine T. could have become entitled to 320 acres under the donation act, and that was to have married some qualified donation applicant prior to December 1, 1851. This she did not do. We do not think the claim of Catherine T. Maynard was within the letter or the spirit of the law. Sec. 5 of the act of February 14, 1853, which is amendatory of the act of September 27, 1850, in our judgment simply extends the time within which persons shall acquire title under the donation act, but it does not undertake to change the qualifications of the applicant. This, we think, has been the universal and unquestioned construction of this statute.

It is claimed by appellant that the acts of Maynard and his wife were of such a character as to create in them a vested right, although no patent had ever issued to them; and cites, to sustain this proposition, *Barney v. Dolph*, 97 U. S. 656; *Lytle v. State*, 9 How. 333; *Stark v. Starrs*, 6 Wall. 417; *Simmons v. Wagner*, 101 U. S. 260. We do not think that the cases cited support the contention. The provision in § 4 of the original donation law, prohibiting the sale of lands until after patent was issued, was repealed July 17, 1854. In *Barney v. Dolph*, the court decided that the repeal of this provision implied the power to convey all the government had parted with, but that was the extent of the decision. In that case it was not disputed that Waymire and his wife were entitled to patent; but here the testimony is that Catherine T. Maynard never could have secured a patent; that she had no right to a patent, and therefore had nothing to sell. *Simmons v. Wagner* was a case where the land was sold by the United States, and the purchase money paid. There the purchase money was the main consideration, and it was held that, where the right to a patent has once become vested in a

purchaser of public lands, it is equivalent, so far as the government is concerned, to patent actually issued. To the same effect is *Stark v. Starrs* and *Lytle v. State;* but these cases have no application to the case at bar, because the main question here is whether or not the right to patent ever did become vested. If we assume that it did, we take for our premises the very question in controversy. So far as cases are concerned which are cited showing that the final certificates of registers and receivers in pre-emption cases confer vested rights, they are not in point here; for, although this court is divided in its opinion as to the force and effect of such certificates (see *Pierce v. Frace, ante,* p. 81), yet such certificates stand on a distinct footing, the pre-emption law especially providing "that the proof of settlement and cultivation shall be made to the satisfaction of the register and receiver." Here a discretion is vested in the register and receiver. But § 7 of the donation law (act of 1850), among other provisions regarding the proof of donation settlers, says:

"And upon such proof being made, the surveyor-general, or other officer appointed by law for that purpose, shall issue certificates, under such rules and regulations as may be prescribed by the commissioner of the general land office, setting forth the facts in the case, and specifying the land to which the parties are entitled. And the said surveyor-general shall return the proof so taken to the office of the commissioner of the general land office; and, if the said commissioner shall find no valid objection thereto, patents shall issue for the land according to the certificates aforesaid, upon the surrender thereof."

No discretion whatever was given to the surveyor-general, but, on the contrary, it was especially conferred upon the commissioner. And in *Stark v. Starrs* the court decided, in construing this act, that the right of the claimant to a patent became perfected when the certificate of the surveyor-general and the accompanying proofs were re-

ceived by the commissioner of the general land office, and he found no valid objections thereto. The main question in controversy in that case was, as to whether the land in controversy was brought under the operation of the town-site act by the organic law of August 14, 1848, establishing the territorial government of Oregon, thus rendering it not subject to the donation act of 1850; and it was upon this proposition that the commissioner objected to the issue of the patent to Stark, and not upon the ground that he found any fault with the proof made of settlement and cultivation under the donation act. And the supreme court of the United States, finding that the provisions of the town-site act did not embrace the land in controversy, and that it was subject to donation entry, and that the proof of residence and cultivation under the donation act had been made and submitted to the commissioner, and that he found no valid objections thereto, sustained Stark's entry. But that state of facts does not exist in this case. But on the other hand the commissioner, in construing the provisions of the donation law, raised an objection to the entry, and decided that Catherine T. Maynard had no rights to the land.

Concluding, then, that the Maynards had no vested rights in the land, we come to the consideration of the question whether or not McAleer is entitled to consideration as an innocent or *bona fide* purchaser for value. In support of the affirmative of this proposition, it is urged that the proofs were made in 1856, and that no fault had been found with them up to the time of his purchase, eleven years afterward; that he made the purchase in good faith, and without any knowledge or notice of defect in the title of his grantors, if one existed; that he was an innocent purchaser, and as such entitled to the same protection as if every requirement of the land laws had been complied with by his grantees; and *Colorado Coal, etc., Co. v. United States,* 123 U. S. 314 (8 Sup. Ct. Rep. 131), and many

other cases were cited in support of this doctrine. While some of the language in the Colorado case would seem, at first blush, to sustain the position of appellant, yet we think a careful examination of the whole case will not justify this conclusion. That was a bill in equity, filed in the name of the United States by the attorney-general, the object and prayer of which was to declare void and cancel sixty-one patents for as many distinct pieces of land alleged to have been fraudulently obtained through collusion and fraud; also that the land was not agricultural, but mineral, land, and therefore not subject to pre-emption entry. The answer of the defendants denied all the allegations in the bill alleging fraud, and denied that any of the lands were mineral lands, and alleged they were innocent purchasers in good faith. Under these issues, the court found that a fraud had been perpetrated upon the United States, and that the parties who acquired title under the patents knew nothing of the frauds; that it was not such a fraud as would prevent the passing of the legal title by the patents; and that it followed that, to a bill in equity to cancel the patents upon these grounds alone, the defense of a *bona fide* purchaser for value, without notice, is perfect; and stated, as an elementary doctrine of equity, that "where a grantor has been induced by fraud to part with the legal title to his property, he cannot reclaim it from subsequent innocent purchasers for value." It will be observed that the court was considering this case with reference to the passing of the legal title, and not a mere equitable interest, and a title, too, which was evidenced by the highest authority — a patent from the United States. The patents to all these different pieces of land having been issued prior to the deed made to the defendants, the court in that case rendered its decision with particular reference to the character of the title, as is easily gathered from its approval and quotation of the opinion of the supreme court of the

United States in the *Maxwell Land Grant Case*, 121 U. S. 325 (7 Sup. Ct. Rep. 1015), where the court says:

"If the proposition as thus laid down in the cases cited is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal? In this class of cases the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles depending upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof."

But in the case at bar McAleer is attempting to set aside this conveyance by the government, a conveyance by patent, an instrument under seal, and the signature of the president of the United States; a proof of title which is commonly accepted and relied upon by the unprofessional mind as conclusive. And what claim does he interpose against it? Not a patent to the land himself, as did Stark in the case cited by appellant of *Stark v. Starrs;* not a deed from parties whose qualifications under the donation act were unquestioned, and whose rights to a patent to the land, by reason of their fulfillment of the requirements of the law, were conceded by all parties to the controversy, as did Dolph in *Barney v. Dolph;* but a deed from a party who the land department decided had no rights to the land in controversy, and to land which the department, as we believe rightfully, restored to the public domain. And this deed was, as the record shows, given to McAleer more than a year before the original donation certificate issued to his grantors from the local land office. So that McAleer simply took by that deed what the Maynards had a right to sell; and, as they had no right to sell anything, he took

nothing. He purchased an inchoate or imperfect title, and he must stand or fall by it as it existed in the hands of his grantors. *Kramer v. Arthurs*, 7 Pa. St. 170; *Briscoe v. Ashby*, 24 Gratt. 478.

Concluding, then, that McAleer has no rights under his deed from the Maynards, we come to the consideration of the rights he claims to have acquired by virtue of his home-stead application. After his pre-emption claim, which he made in 1874, had been decided against him by the commissioner, and subsequently, on appeal, by the secretary of the interior, he made application to make homestead entry. This was on April 1, 1880. The district land office refused the application. Whatever rights he may have had under that application, by reason of residence or otherwise, we are not called upon to investigate here; for he had the right of appeal, and did not avail himself of it, and that application was virtually abandoned. However, we seriously question if § 3 of the act of May 14, 1880, could be construed to confer any right in McAleer, as against rights of other parties existing at the time of the passage of the act; and are inclined to think that it was the intention of the law not to interfere with any intervening rights, the same as many other provisions of the land laws for the relief of settlers. Prior to McAleer's application, and prior to the passage of the act of May 14, 1880, to wit, on January 8, 1880, Lewis and Hill made application to locate Porterfield warrants on the land in question. This application was rejected for the reason that the land was embraced within the limits of the town of Seattle, but afterwards, upon appeal, it was allowed, and in course of time patents were issued therefor. On the 16th day of December, 1880, the application of the city of Seattle for the land was withdrawn. On that day McAleer made homestead application for the land, and his application was rejected on the ground that such land had been previously applied for by said Lewis and Hill.

With this view of the law, then, the controversy is narrowed to this proposition: Were the lands legally located by the said Porterfield scrip? Appellants contend—*First,* That Porterfield warrants are not locatable upon occupied lands; *second,* that the warrants are not assignable; and, *third,* that the warrants are not locatable upon unoffered land. The act of congress approved April 11, 1860, entitled "An act for the relief of the legal representatives of Charles Porterfield, deceased," provides, among other things, that Porterfield warrants may be located on any of the public lands which have been and may be surveyed, and which have not been otherwise appropriated at the time of such location, within any of the states of the United States where the minimum price for the same shall not exceed $1.25 per acre, etc. It is claimed by the appellee that the phrase "otherwise appropriated" means any public lands not regularly appropriated by virtue of some provision of law for its disposition; and it is insisted that the language in this case is distinguished from that employed in the act of April 5, 1872, providing for the location of Valentine scrip, where the language was, "such scrip may be located upon any of the unoccupied and unappropriated lands of the United States." This is the construction given to this expression by the land department, and, in our judgment, is the correct one. There would be no reason or justice in allowing a mere unauthorized and illegal occupancy to prevent the location; and, if appellant's interpretation is to be accepted, it matters not how illegal or unwarranted the occupancy may be. Besides, there is a well recognized difference in the words. Webster's first definition of "appropriation" is, "setting apart for a particular use." Occupancy may always include an appropriation, but an appropriation does not necessarily include occupancy. For instance, the government may appropriate land for military reservations or Indian reservations, but they may or may

not occupy them as such. This is a word commonly used by the government in setting aside lands for special purposes, and we cannot give it the construction claimed by appellee without doing violence to its generally accepted meaning. This is the view evidently taken by the supreme court of the United States in the case of *Wilcox v. Jackson,* 13 Pet. 512, where the court says:

"Now, this is appropriation, for that is nothing more nor less than setting apart the thing for some particular use."

As to the assignability of these warrants, the act for the relief of Porterfield provided for the appropriation of these lands according to the directions contained in his last will and testament; and the will, which is filed as an exhibit in this case, "authorizes and empowers the trustees, in their discretion, to sell or exchange, or otherwise dispose of, all or any part of the property herein given in trust, and the proceeds arising from such sale, exchange, etc., to re-invest in other property." Construing the act in connection with the will referred to by the act, it appears to us that the intention of congress was to make the warrants assignable. By the ancient common law, things in action, expectancies, possibilities and the like were not assignable, and the assignee thereof acquired no rights which were recognized by a court of law; and says Mr. Pomeroy:

"The court of chancery from an early day rejected this rule as narrow, and even absurd. . . . Equity has always held that the assignment of a thing in action for a valuable consideration should be enforced." Pom. Eq. Jur., § 1270.

Again, the act was so construed by the executive department of the government, which was charged with issuing the warrants in form; and the said warrants are on their face issued to William Kinney and Thomas J. Michie, as executors of Robert Porterfield, deceased, or their assignees,

etc.; and a note at the bottom of the warrants, over the signature of the commissioner of the general land office, is as follows:

"This warrant may be located upon unoffered land, and is assignable in the manner and form prescribed by the rules and regulations of this office under the act of March 3, 1855."

The statute having been thus construed by the executive department of the government, and innocent parties having acquired rights under that construction, those rights ought not to be divested, unless it clearly appears that the construction was wrong. The supreme court of the United States, in *United States v. Moore*, 95 U. S. 763, says:

"The construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. The officers concerned are usually able men, and masters of the subject. Not unfrequently they are the draftsmen of the laws they are afterwards called upon to interpret."

In support of this doctrine is cited *Edwards v. Darby*, 12 Wheat. 210; *United States v. Bank*, 6 Pet. 29, and *United States v. Macdaniel*, 7 Pet. 1. In *Brown v. United States*, 113 U. S. 568 (5 Sup. Ct. Rep. 648), it was held that, in case of ambiguity in a statute, contemporaneous and uniform executive construction is regarded as decisive. To the effect that great weight should be given to such construction, we cite *Edwards v. Darby*, 12 Wheat. 206; *Manufacturing Co. v. Ferguson*, 113 U. S. 727 (5 Sup. Ct. Rep. 739); *United States v. Dickson*, 15 Pet. 141; *United States v. Gilmore*, 8 Wall. 330. In addition, we see no reason why these warrants should be excluded from the provisions of § 1 of the act of March 22, 1852, entitled "An act to make land warrants assignable, and for other purposes." That act is sweeping in its declarations. It declares "that all warrants ȷfor military bounty lands,

which have been or may hereafter be issued under any law of the United States, . . . are hereby declared to be assignable," etc. It is true that these warrants are not like some other military land warrants, but they were given to Porterfield's heirs for military services rendered by Porterfield or in lieu of other lands which had been given to him for such services in the Revolutionary war, which amounted to the same thing, and are to all intents and purposes military land warrants, and as such are assignable under the general statute.

We do not think from the language of the statute, that it contemplated restricting these locations to lands only that were subject to private entry; or, in other words, to simply fix upon them a value of $1.25 per acre; and, unless it clearly appears from the act that such was the intention, the executive department having placed the other construction upon the act, and having made them locatable upon unoffered land upon their face, under the doctrine of the law in the last cases above cited, we do not think we are justified in disturbing rights that have been acquired under this construction of the law. There is no question but that many of the equities in this case are in favor of McAleer and his heirs, and, were we to decide the case upon sympathy, our judgment would probably be different; but, as we view the law, there is no escape from the conclusions we have reached. In the court below damages were awarded in the sum of $750 to appellee for the detention of the premises, without allowing anything for the improvements made. Section 541 provides that, "when permanent improvements have been made upon the property by the defendant, or those under whom he claims, holding under color of title, adversely to the claim of the plaintiff, in good faith, the value thereof at the time of trial shall be allowed as a set-off against such damages." Under this statute, appellee

in this court waives any right to damages, and consents that the judgment be so modified.

The order of the court is, that the judgment of the court below be so modified, and that with such modification judgment is affirmed.

ANDERS, C. J., and SCOTT, STILES, and HOYT, JJ., concur.