[No. 217.  Decided December 16, 1891.]

JOHN KEANE, *Appellant*, v. ANNA SOPHIA BRYGGER, *Executrix*, AND OLE SCHILLESTAD, *Executor*, *of the Estate of Johan Brygger, Deceased, Respondents.*

PUBLIC LANDS—HOMESTEAD ENTRY—RELINQUISHMENT—UNIVERSITY GRANT —TITLE—CURATIVE ACTS.

Although there was no provision of law, prior to the act of congress, May 14, 1880, for a voluntary relinquishment of lands filed on under the homestead act, an entryman had a right, recognized by the uniform practice of the land department, to disclaim and relinquish all interest in the entry.

Under such voluntary relinquishment, the land department was authorized to cancel the entry and restore the land to the public domain, as by the act of relinquishment the homestead entry no longer remained a subsisting entry sufficient to constitute such an appropriation of the tract as would segregate it from the public domain.

Under the act of congress of March 14, 1864 (13 U. S. St. at Large, p. 28), and the act of the territorial legislature of Washington, October 26, 1875, confirming titles to university lands in Washington Territory, all irregularities were cured in a deed executed by the university commissioners on March 10, 1864.

Under the act of congress of March 14, 1864, constituting the secretary of the interior a tribunal to pass upon sales by territorial

authorities of lands granted for university purposes in the territories of Oregon and Washington, and to approve same if *bona fide*, the approval to vest title in the territory and its vendees, the decree of the secretary is conclusive.

### Appeal from Superior Court, King County.

Action by Anna Sophia Brygger, executrix, and Ole Schillestad, executor, of the last will and testament of Johan Brygger, deceased, against John Keane, to recover possession of a certain tract of land. Defendant answered, setting up that said land had been public land of the United States, subject to homestead entry, upon which he had made a homestead, which was uncanceled, and that he was living thereon, under said entry, under the homestead laws of the United States. Plaintiffs replied, setting up title in their testator by mesne conveyances from the United States, through the university commissioners of the Territory of Washington, claiming the land as university land under the grant or reservation by congress to the Territory of Washington of two townships of university land. Trial by the court, and judgment for plaintiff.

*Junius Rochester,* and *Thompson, Edsen & Humphries,* for appellant.

*Jacobs, Jenner, Legg & Jacobs,* and *W. Lair Hill,* for respondents.

The opinion of the court was delivered by

DUNBAR, J.—We will first notice the contention of the appellant, that the land in controversy, from June 26, 1863, to December 20, 1871, was segregated from the public domain, and was not subject to be selected for university purposes during that time. This contention is founded on the fact that said land was embraced in the homestead entry of one Lemuel J. Holgate, made and duly entered in the proper land office on June 26, 1863, and

was not canceled until December 20, 1871. The testimony shows that Holgate executed a relinquishment to the land before the alleged selection of the university. This is shown by the testimony of Daniel Bagley, who, as president of the board of university commissioners, executed the deed to Ross. Mr. Bagley testified as follows:

"I saw the relinquishment before I filed the selection in the land office or sold to Ross."

"Q. Do you know what became of the relinquishment? A. I filed it, or had it filed, in the land office at Olympia."

This testimony is substantiated by the petition for a new trial, wherein it appears that a paper purporting to be the receiver's duplicate receipt issued to Lemuel J. Holgate for the land in controversy, was filed in the general land office, and that said paper was indorsed as follows:

"SEATTLE, KING COUNTY, February 16th, 1864.
"I hereby relinquish all my right and title to the within described land in favor of John Ross.
"(Signed)                    LEMUEL J. HOLGATE."

It is claimed, however, that this was not a relinquishment as required by law, but is in effect a quitclaim from Holgate to Ross; and that in fact there was no provision for a voluntary relinquishment prior to May 14, 1880, but that the only way by which lands once filed on under the homestead, pre-emption or timber culture acts, could be restored to the public domain was either by lapse of time or by contest. This position, we think, is not in accord with either the spirit or letter of the law, or the custom or usage of the land department. Section 1 of the act of May 14, 1880 (21 U. S. St. at Large, 140), is as follows:

"Be it enacted, etc., etc., That when a pre-emption, homestead or timber culture claimant shall file a written relinquishment of his claim in the local land office, the land covered by such claim shall be held as open to settlement and entry without further action on the part of the commissioner of the general land office."

All the effect this law had was to give authority to local land officers to cancel the entry at once, without awaiting the action of the commissioner of the general land office, which was the practice before its passage. It has always been the uniform practice of the land department to cancel entries on the voluntary relinquishment of the entryman; and it would be a strange doctrine to announce that a party did not have the right to relinquish any right that he had to, or in, any property; and that it was the intention of the government to compel its citizens to go to the expense and delay of a contest to extinguish an interest of another citizen who was willing to make a disclaimer of that interest. The object of the homestead law was to furnish homes to the citizens of the government, and to encourage the settlement of its public domain; to make the acquisition of these homes as easy and cheap as possible, and not to wantonly and senselessly place obstructions in the way of such acquisition. Of course the policy of the government is to protect the rights of the homestead claimant while he is endeavoring to comply with the requirements of the law; but when the government becomes satisfied that there has been an abandonment of such right by the applicant, the entry will be canceled and the land will be subject to the re-entry of some one who will comply with the law. The question whether or not there has been an abandonment must be determined, like every other question of the kind, by evidence; and there certainly could be no higher or more convincing testimony than the testimony of the applicant himself, by a formal relinquishment of his rights to the land, endorsed on his original receipt and filed in the land office. After this proof of abandonment it would certainly be a useless form to require a contest to prove the very thing that was admitted and asserted by the original entryman. Section 2297 of the Revised Statutes, which appellant claims was the only law in force up to May 14, 1880, in no sense con-

flicts with the idea of a voluntary relinquishment, but is in perfect harmony with that practice. It is as follows:

"SEC. 2297. If, at any time after the filing of the affidavit, as required in section twenty-two hundred and ninety, and before the expiration of the five years mentioned in section twenty-two hundred and ninety-one, it is proved, after due notice to the settler, to the satisfaction of the register of the land office, that the person having filed such affidavit has actually changed his residence, or abandoned the land for more than six months at any time, then, and in that event, the land so entered shall revert to the government."

This section, it is true, provides for a contest, and the proper officers of the land department, by virtue of their supervisory powers, prescribed rules and regulations governing this contest; but this section is not exclusive, and will only be invoked when necessary. If the homestead applicant has abandoned his claim and has gone, or if he has not complied with the law, and refuses or fails to relinquish, this section prescribes the remedy; but there can be no such thing as a contest with one who will *not* contest, but is willing to, and does, grant everything that is asked of him. It might as well be claimed that a settler could not waive notice because the words, "after due notice to the settler," occur in the section, as to hold that he could not waive the proof required. The proof of abandonment is the essential thing required; and even the wording of the section, literally construed, would make the relinquishment sufficient proof in that kind of a proceeding; and the cases cited by appellant are not in any sense opposed to this view. While in some cases certain segregated remarks of the court might possibly lead to such a conclusion, yet in every instance, when the facts of the case are examined, it is found that the opinion was based on the theory that there had been no abandonment proved at all, either by voluntary relinquishment or by contest proceed-

ings. Many of these cases have been decided since the
act of May 14, 1880, and the language used is the same,
and they in no way tend to establish the doctrine that
there cannot be a voluntary relinquishment; but the doc-
trine announced is, that the fact of the abandonment
must be established before the entry can be canceled.

In the case of *Kansas Pacific Ry. Co. v. Dunmeyer*, 113
U. S. 629 (5 Sup. Ct. Rep. 566), it was decided that under
the acts granting lands to aid in the construction of a
line of railroad from the Missouri river to the Pacific
ocean, the claim of a homestead or preëmption entry
made at any time before the filing of the map in the gen-
eral land office had attached, within the meaning of
those statutes, and no land to which such right had
attached came within the grant; and that the subsequent
failure of the person making such claim to comply with
the acts of congress concerning residence, cultivation and
building on the land, or whose actual abandonment of
the claim does not cause it to revert to the railroad com-
pany and become a part of the grant. The claim having
attached at the time of filing the definite line of the road,
it did not pass by the grant, but was, by its express terms,
excluded, and the company had no interest, reversionary
or otherwise, in it. Many questions entered into the con-
sideration of that case that are not in the case at bar;
and that case was mainly decided on the special restric-
tions in the granting law, such as for instance, "not sold,
reserved or otherwise disposed of by the United States,
and to which a preëmption or homestead claim might
not have attached at the time the line of said road is
definitely filed;" and the further declaration that the
grant "shall not defeat or impair any preëmption, home-
stead, swamp land or other lawful claim." But nothing
in that decision touches this case. In speaking of the ef-
fect of the homestead application, the court said "it meant
that by such a proceeding a right of homestead had fas-

tened to that land which could ripen into a perfect title by future residence and cultivation." And a long line of authorities, including *Hastings, etc., R. R. Co. v. Whitney,* 132 U. S. 357 (10 Sup. Ct. Rep. 112), and all other cases cited by appellant on this point, hold substantially the same doctrine; and it is not disputed, so long as the homestead entry valid upon its face remains a subsisting entry, that it is such an appropriation of the tract as segregates it from the public domain. But Holgate's entry was *not* a subsisting entry, and could not ripen into a perfect title by future residence or cultivation; for by his own act he had precluded such a consummation, and his rights to perfect title to that land were as effectually gone as though a contest had been decided against him ; and every case cited by appellant is decided on the theory that the applicant's abandonment had not been proven in any manner whatever, either by contest or relinquishment; and no case can be found which holds that a voluntary relinquishment is not sufficient authority to the land department to cancel an entry, and restore the land to the public domain. The particular form of the relinquishment is of very little importance; and where the department has been satisfied, no court that we know of has ever interfered. The thing to be ascertained is whether or not the applicant intended to relinquish his right; if this can be gathered, all statements to the effect that the relinquishment is made in favor of a particular person, will simply be treated as surplusage; such has been the universal practice of the department, and we think has never been questioned. It is true that Holgate's relinquishment was not acted on in this case until 1871, after the selection for the university; but the fact remains that the relinquishment was executed by Holgate, February 16, 1864, prior to the selection of the university lands, and, according to the testimony of Bagley, was filed in the proper local land office prior to such selection. The law had been fully com-

plied with so far as the university commissioners were concerned; they had seen to it that the relinquishment had been filed in the proper land office, and they had no further jurisdiction over it and could no longer be responsible for it. This was the view taken by the land department, and we cannot do better than to quote the language of Secretary Teller when he says, in relation to the entry of Fred. Jenson, who was attacking the selection of the university on the same grounds, "the fact that Holgate's relinquishment was not returned to and noted on your records until 1871, shows irregularity on the part of the local officers, but cannot affect the right of the university." This language was quoted by Commissioner Stockslager in sustaining the rejection to Keane's entry to the same land in January, 1889, and it seems to us is so manifestly in accord with justice and proper rules governing its administration, that it needs no discussion or argument to sustain it.

The deed from the university commissioners to Ross was executed March 10, 1864; and whatever irregularities there were in that deed, if any, were cured by the act of congress of March 14, 1864 (13 U. S. St. at Large, p. 28). Said section reads as follows:

"*Whereas,* It is declared in the fourth section of the act of congress approved July seventeenth, eighteen hundred and fifty-four, amendatory of the act approved September twenty-seventh, eighteen hundred and fifty, creating the office of surveyor general of the public lands in Oregon, etc., that in lieu of the two townships of land granted to the Territory of Oregon, by the tenth section of the act of eighteen hundred and fifty, for universities, there shall be reserved to each of the territories of Washington and Oregon two townships of land of thirty-six sections each, to be selected in legal subdivisions, for university purposes, under the direction of the legislatures of said territories, respectively; and

"*Whereas,* It is represented that sales have been made by territorial authorities of lands selected in virtue of the

terms of said act of seventeenth July, eighteen hundred and fifty-four, authorizing selections to be 'reserved,' merely, under the conviction that they had the power to dispose of the same as a fee simple grant;

"*Therefore, be it enacted,* * * * That in all cases of sales made to individuals by the territorial authorities prior to the passage of this act, in which it may be shown to the satisfaction of the secretary of the interior that such sales were *bona fide,* and of the class hereinbefore mentioned, and that the tracts so sold are selections in all other respects regular and proper, it shall and may be lawful for the said secretary to approve such selection as a grant in fee simple, and a transcript, certified under the seal of the general land office by the commissioner thereof, of such approval, shall vest the title in the territory, and in its *bona fide* vendees."

It is stoutly urged by the appellant that no selection was made of the land in controversy in the manner specified by law; that plat No. 2 was not filed in the land office until March 5, 1867, after the passage of the law by the territorial legislature, January 31, 1867, removing Daniel Bagley and others as university commissioners, and that consequently such filing and selection were without authority of law, and void. So far as the action of the territory is concerned, its legislative intent was pretty plainly expressed in an act entitled, "An act to confirm titles to university lands in Washington territory," approved October 26, 1875. Section 1 of said act provides:

"That all deeds of conveyance for university lands in this territory, which have been executed since the passage of the act entitled, 'An act to provide for the selection and location of the land reserved for university purposes, to appoint a board of commissioners, and to provide for the selection and location of a site for the territorial university,' passed on the eleventh day of January, one thousand eight hundred and sixty-one, in the name of Daniel Bagley, president of the board of university commissioners, instead of being executed in the name of the Territory of Wash-

ington, shall be deemed, taken and held good and valid deeds in law; and shall have the force and effect to pass from the Territory of Washington to the purchaser or purchasers named in such deeds respectively, their heirs, executors, administrators and assigns, all the right, title and interest there vested, or which may thereafter be vested in the Territory of Washington in and to the lands described in said deeds, as though in each and all respects the deeds, in their form and manner of execution, had conformed to the requirements of law."

Of course there is no disputing the contention of appellant that the territory had no authority to pass any act to convey title out of the United States; nor is it contended here that there was any such attempt on the part of the territory, but it was an attempt, so far as the interests of the territory were concerned, to cure all irregularities in the commissioner's deeds, and to pass the titles to *bona fide* purchasers; and the United States had the same object in view in the curative act of March 14, 1864, and as both the United States and the territory saw fit to provide by statute for confirming the titles to these lands in *bona fide* purchasers years before any attempt was made by the appellant to obtain title to them, it certainly does not lie in his mouth to complain or object.

It is said that no action was taken, as shown by the record in the case at bar, in compliance with the requirements of the statutes granting university lands. The plaintiff, however, did introduce a certified copy of the approval of such selections by the secretary of the interior. The certificate of approval referring to the list embracing the land in question is as follows:

"DEPARTMENT OF THE INTERIOR,
GENERAL LAND OFFICE,
April 20, 1889.
"It is hereby certified that the tracts described in the foregoing list are embraced in the original list on file in this office of lands selected in the Olympia (now Seattle)

land district, Washington Territory, by a duly authorized agent of said territory, under the provisions of the above cited acts of congress, approved July 17, 1854, and March 14, 1864.

"It is further certified that the said tracts have been examined and compared with the township plat and tract book of this office, and are found to be subject to selection, and free from conflicts; and satisfactory proof having been furnished this office of the *bona fide* sale of the land by the territorial authorities, and the selections being in every respect regular, proper and in accordance with the provisions of the above named act of congress of March 14, 1864, it is therefore recommended that the list, embracing ninety-nine acres, be approved as a grant in fee simple of the land therein described to the said Territory of Washington, said approval being subject to any valid interfering rights which may have existed at the date of selection.

"S. M. STOCKSLAGER, *Commissioner.*

"DEPARTMENT OF THE INTERIOR,
April 22, 1889.

"The foregoing list of university selections, embracing ninety-nine acres, is hereby approved as a grant in fee simple of the land therein described to the Territory of Washington, said approval being subject to any valid interfering rights which may have existed at the date of selection.

"JOHN W. NOBLE, *Secretary.*"

This finding was authorized by the act of March 14, 1864, which constituted the secretary of the interior a tribunal to judicially pass upon the very questions passed upon by the secretary of the interior in this case. The language of the act is, "in which it may be shown to the satisfaction of the secretary of the interior that such sales were *bona fide,*" etc., and when the requirements therein specified are shown to the satisfaction of the secretary of the interior, the title shall vest in the Territory and its *bona fide* vendees. The certificate shows that these requirements have been performed to the satisfaction of the

secretary, and the transcript of approval has been certified in a manner prescribed by law, and upon the certificate of such approval the title vested in the Territory and its *bona fide* vendees. Here is an officer constituted by the government the sole judge of certain facts, and judicial authority and discretion conferred upon him as a tribunal, in language plain and unmistakable. The proof tending to show the *bona fides* of the sale, the class of the land, and the regularity of the sale, must be submitted to this tribunal, and if the proof is made to the satisfaction of such tribunal the approval will be made, and not otherwise; and when the approval *is* made, in the absence of fraud, it will be conclusive. The decree of the secretary is the final adjudication upon the question of right, and all action after that is merely in the execution and enforcement of that right. It is a well established rule governing all the departments of the government that, where a special tribunal is authorized to hear and determine certain matters arising in the course of its duties, its decisions within the scope of its authority are conclusive. *Johnson v. Towsley*, 13 Wall. 72. In *French v. Fyan*, 93 U. S. 169, a patent had been issued to the State of Missouri for swamp lands, under a certain act of Congress. In an action for ejectment by a party claiming title under a grant from a railroad company, which would have carried the title if the land were not swamp and overflowed, it was offered to prove that the land was not of that character. It seems to us that it was very nearly a parallel case with this one, and in that case the court said:

"We are of the opinion that, in this action at law, it would be a departure from sound principles, and contrary to well considered judgments in this court, and in others of high authority, to permit the validity of the patent to the state to be subjected to the test of the verdict of a jury on such oral testimony as might be brought before it.

It would be substituting the jury, or the court sitting as a jury, for the tribunal which congress had provided to determine the question, and would be making a patent of the United States a cheap and unstable reliance as a title for lands which it purported to convey."

In *Quinby v. Conlan,* 104 U. S. 420, the court said:

" It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the land department, on mere questions of fact presented for their determination."

In *Vance v. Burbank,* 101 U. S. 514, it was decided that the decisions of the appropriate officers of the land office, who had been constituted a special tribunal to decide certain questions, were final to the same extent as those of judicial or *quasi* judicial tribunals were.    See also *United States v. Flint,* 4 Sawy. 42; *Warren v. Van Brunt,* 19 Wall. 646; *Shepley v. Cowan,* 91 U. S. 330; *Moore v. Robbins,* 96 U. S. 530; *Marquez v. Frisbie,* 101 U. S. 473. Many of these cases were reviewed, and the doctrine reaffirmed, in *Steel v. Smelting Co.,* 106 U. S. 447 (1 Sup. Ct. Rep. 389).    It is true that in this case the approval of the list embracing this land was not made until April 22, 1889, while appellant's entry was made October 20, 1888, but the approval relates back to the time of the selection.    The allowance of appellant's entry was a mere inadvertence on the part of the land officers and was corrected as soon as the true state of the record was discovered.    By such inadvertence he could certainly obtain no vested rights as against the *bona fide* purchaser of the land.    All these statutes have been construed by those whom the law specially appointed to construe and execute them, and it is a principle well recognized by the courts that the construction given to statutes by those charged with the duty of executing them should not be overruled without cogent reasons.

*United States v. Moore*, 95 U. S. 760. In that case the court said:

"The officers concerned are usually able men and masters of the subject. Not unfrequently they are draftsmen of the laws they are afterwards called upon to interpret."

In *Brown v. United States*, 113 U. S. 568 (5 Sup. Ct. Rep. 648), it was announced that in case of ambiguity in a statute, contemporaneous and uniform executive construction is regarded as decisive. To the same effect is *Edwards' Lessee v. Darby*, 12 Wheat. 210; *United States v. State Bank of North Carol'na*, 6 Pet. 29; *McSorley v. Hill*, 2 Wash. 638 (27 Pac. Rep. 552).

So far as appellant's claim to the right of trial by jury is concerned, it seems that this case was treated by him at the trial below as an equitable action, and that he interposed an equitable defense to the complaint, and that both parties voluntarily went to trial without a jury. Whether, in a case where this question was properly presented, this court would hold that a party waived his right of trial by jury by proceeding to the trial of the cause by the court, without demanding a jury, and without interposing any objection, we do not now decide nor indicate. But in this case the alleged error was not brought to the attention of the court in the motion for a new trial. And in any event it would be error without prejudice, for the testimony which was submitted by the plaintiff, and which was necessary to prove his claim, was undisputed by the appellant, excepting so far as its admissibility, its construction and its legal effect were concerned, which were purely legal questions, to be decided by the court. Other testimony, it is true, was admitted, but there was no disputed testimony, the admission of which was necessary to a rightful determination of the issues involved.

The points discussed above were mainly relied upon by appellant to reverse this judgment. However, we have

examined the other points raised in the different briefs filed by appellant, and fail to find any error. We think the findings of facts were borne out by the testimony, and that the conclusions of law were justified by such findings.

The judgment is, therefore, affirmed.

ANDERS, C. J., and SCOTT, HOYT, and STILES, JJ., concur.