[No. 6668. Decided July 9, 1907.]

A. G. PRICHARD, TRUSTEE, *Respondent*, v. RUTHER JACOBS et al., *Appellants*.[1]

INDIANS—LANDS—ALLOTMENTS—SALE OF LANDS—STATUTES—CONSTRUCTION. Under the act of Congress authorizing a commission to sell lands allotted to the Puyallup Indians, and held by them under restrictions against alienation, the written consent to such a sale, required to be given by an allottee, is not revoked by his death, but finally authorizes a sale without further consent of heirs; especially as the Interior Department has so construed the law, and no reason exists for departing from such construction.

Appeal from a judgment of the superior court for Pierce county, Huston, J., entered August 4, 1906, upon findings in favor of the plaintiff, upon an agreed statement of facts, in an action to quiet title. Affirmed.

*Ira A. Town* and *E. D. Wilcox*, for appellants.

*Ellis & Fletcher*, for respondent.

HADLEY, C. J.—This is a suit to quiet title to land. All the defendants made default except Ruther Jacobs and Lillie Jacobs, and E. D. Wilcox as their guardian. The cause was

[1]Reported in 90 Pac. 922.

tried upon an agreed statement of facts, from which we gather
the following extended and somewhat complicated chain of
facts: The land lies in the Puyallup Indian reservation, and
was allotted or patented by the United States, on the 30th
day of January, 1886, to Charley Jacobs, the head of a
family, and to other members thereof, who will be hereinafter
mentioned. These were all Puyallup Indians, and said allot-
ment or patent was subject to the stipulations and conditions
contained in article 6 of the treaty of the United States with
the Omaha Indians. That provision empowered the president
to cause allotments to be made from reserved lands to such
Indians as were willing to avail themselves of the privilege,
and who would locate on the same as a permanent home. On
March 3, 1893, Congress passed an act empowering the presi-
dent to appoint a commission of three persons, and defined the
duties of the commission, which, among other things, were to
select and appraise such portions of the allotted lands as were
not required for homes for the Indian allottees, to sell the same
for the benefit of the allottees at public auction after due no-
tice, to superintend the sales, ascertain who are the true
owners of the allotted lands, make deeds to the purchasers
subject to the approval of the secretary of the interior, the
amount received for the lands to be placed in the treasury to
the credit of the Indian entitled thereto, the same to be paid
to him in such sums and at such times as the commissioner of
Indian affairs, with the approval of the secretary of the in-
terior, shall direct. No part of the allotted lands shall be
offered for sale until the Indian or Indians entitled to the same
shall have signed a written agreement consenting to the sale
thereof, and appointing said commissioners, or a majority of
them, trustees to sell the land and to make a deed to the pur-
chaser thereof, the deeds not to be valid until approved by
the secretary of the interior who is directed to make all neces-
sary regulations to carry out said provisions.

On November 6, 1893, the department of the interior in-
structed the commissioners, who were appointed in pursuance

of the act of Congress aforesaid, to appraise the allotted lands
not required for homes for the Indians, to obtain written
agreements from the allottees consenting to the sale of lands
at sums not less than the appraiser's value, and appointing
and constituting the commissioners trustees to sell the lands
and make deeds to purchasers, to determine according to the
laws of the state of Washington the legal heirs of allottees or
heads of families who have died since the issuance of patents
for lands selected and appraised for sale, to have guardians
appointed for the minor heirs of deceased allottees, and to
obtain the consent of the heirs of twenty-one years and of such
guardians.  The commissioners were instructed to report to
the department of the interior for approval, and that upon
approval further instructions would be given appertaining to
the sale of the lands and making deeds to the purchasers.  In
1895 the commissioners received further instructions, among
other things to the effect, that they were not required to go
into the state courts in order to determine who are the heirs
of these allottees, but that they themselves should apply the
rule prescribed in their instructions, and when the heir or true
owner is so ascertained they should obtain his consent to the
sale of his allotment; that the president has the right to pre-
scribe rules for the descent of these lands; that the president
speaks and acts through the heads of the several departments
in relation to the subjects which appertain to their respective
duties; that the secretary of the interior is the officer charged
by law with the management and control of Indian affairs;
that the allottees are still the wards of the nation, and the sec-
retary of the interior is the officer charged by law with the
duties of guardianship.

Under date of July 2, 1897, the department of the interior
notified Clinton A. Snowdon that he had been appointed com-
missioner of lands of the Indian reservation, under the act
of June 7, 1897.  This act was practically in all respects simi-
lar to the act of March 3, 1893, except that it provided for
one commissioner instead of three.  At the same time the in-

terior department gave him instructions, among other things, as follows:

"It will be your duty to sell or offer for sale under previous instructions to the commission, the unsold allotted lands whose appraisements have been approved and sale authorized, and to obtain the written consents of sale, if possible to do so, of other Indian allottees and the members of their families. . . When such schedules, written consents and appraisals shall have been received, they will be laid before the secretary of the interior for his consideration and approval. Upon approval of the appraisements and authorization of the sale of the lands you will be instructed to sell the same. . . . That the title under these patents vests in the family whose names are recited in the patent, and not in the head of the family. It is necessary to obtain the written consent of all the members of the family named in the patent. That it is necessary to have legal guardians appointed for minors who are themselves allottees, but not minor heirs of deceased allottees. It is necessary to obtain the written consent of sale of allotments of all members of the family named in the patent, and natural guardians and parents of minors are incompetent for this purpose, as in the case of minor heirs of deceased allottees."

The allottees named in the patent for the lands in controversy, and their relation to each other, were as follows: Charley Jacobs, the head of the family; Julia, his wife; Annie, his sister; Frank, his son by a former marriage, and Oscar, his son by his wife Julia. The answering defendants, Lillie and Ruther Jacobs, are the children of said Charley and Julia, and were born after the issuance of the patent, Lillie in the year 1888, and Ruther in 1891. There is also living Sam Johnny, a son of Julia by a former husband, not named in the patent. Annie, named in the patent, died in the month of November, 1888, never having been married, leaving no father, mother, children, brothers, or sisters, except Charley Jacobs, who was her sole heir. On the 7th day of March, 1898, Charley, Julia, and Frank, all of age and named in the patent, subscribed and acknowledged a written consent to

Commissioner Snowdon, appointing him trustee to sell the lands in controversy here, under the act of March 3, 1893. On August 29, 1898, Charley Jacobs, as guardian of Oscar Jacobs, named in the patent, having been previously duly appointed such guardian, signed and acknowledged a similar consent, and on October 7, 1898, he, as sole heir of Annie, named in the patent, signed and acknowledged a similar consent. These consents with the appraisement and other papers were then transmitted by Mr. Snowdon to the secretary of the interior, and were by the latter approved February 20, 1899. On February 27, 1901, Mr. Snowdon offered the premises for sale at public auction, and they were purchased by the plaintiff in this action, for $1,250, he paying $420 in cash, the remainder to be paid in five equal payments, to wit, on or before February 27 in each of the next succeeding five years, with interest at six per cent per annum. Mr. Snowdon then executed and delivered to this plaintiff as such purchaser a deed for the land. The deed recited that it should operate as a complete conveyance of the land upon full payment of the purchase money, the terms for payment being also specified. Prior to the commencement of this suit, the plaintiff paid to the proper United States authorities all the payments agreed upon in said commissioner's deed, and the same have been received and accepted by the interior department for distribution to those entitled to the same.

Prior to the making of said sale and conveyance, said Charley Jacobs died, on January 26, 1900, and left surviving him his wife, Julia, his sons Frank and Oscar, all named in the patent; also his daughter Lillie, and his son Ruther, both of whom were born after the patent was issued and were, of course, not named in the patent; and also the said son of Julia by a former husband, Sam Johnny, not named in the patent. The death of Charley was reported to the commissioner of Indian affairs by Mr. Snowdon on May 1, 1900. Julia also died about September 30, 1900. On February 6, 1901, the defendant Wilcox was duly appointed guard-

ian of Lillie and Ruther. After the deaths aforesaid and
before the sale was made, the secretary of the interior, on
January 18, 1901, in answer to an inquiry from Mr. Snow-
don, the Indian commissioner, as to the status of a case where
the original· allottee, after consenting to the sale, had died
leaving heirs who had not given consent, instructed the com-
missioner among other things as follows:

"Where allottees and true owners of Puyallup lands have
executed their consents of sale, the same having been ap-
proved by the secretary, it has been the practice of the de-
partment to continue the sale of the lands covered thereby in
the case of the death of an allottee or true owner and to dis-
tribute the funds arising from such sale to his or her heirs.
The office and the department have regarded these written con-
sents as remaining in full force and effect upon the decease
of the Indian executing the same—and further, that they are,
as above indicated, in the nature of an agreement or contract
to be carried out for the sole benefit of his heirs in case of
his decease. . . . These lands are sold under the provi-
sions of the Act of Congress, March 3, 1893, and not under
the laws of the state of Washington. . · . . It is for the
department to pass upon the sufficiency of consents and not
the courts of the state of Washington."

The defendant Wilcox, in his various reports as guardian,
has reported that the land in question was sold by the Indian
commissioner, and that he as guardian has received from the
United States, as the proceeds of such sale, a portion of the
shares allotted by the secretary of the interior to his wards, as
heirs of said deceased persons. The said guardian, however,
did not know at the time he received the money that the sale
was made by the commissioner after the death of Charley and
Julia. When he discovered that fact he refused to accept any
further money from the United States as the proceeds of such
sale, and prior to the trial of this action the return of the
money so received was tendered to the plaintiff, and was by
him refused. At the time the plaintiff purchased the premises
he had not been advised of the death of Charley and Julia, and
at no time until a short time before bringing this action did

he acquire such knowledge or learn of the existence of Lillie or Ruther, or that any one, other than those named in the patent and whose consents for sale had been duly given, claimed any interest in the land. He purchased the land in good faith, and relied upon the representations of the commissioner and in full belief of the regularity of his proceedings. The price paid was the full value of the land at the time of the sale, but at the time this suit was brought it was worth, and is now worth, $25,000.

The above facts were submitted to the department of the interior for a decision and interpretation and, among other things, that department, in February, 1906, held and announced as follows:

"The office and the department have uniformly held that the death of an allottee did not revoke his written consent of sale; that such consent was something more than a mere power of attorney; that it was in the nature of a trust, to be carried out in case of his death, for the benefit of his legal heirs. The Puyallup Commission was made a trustee by the respective written consents executed by the allottees and true owners of Puyallup allotted lands, to sell and convey the lands for which consent of sale had been given. Such written consents were regarded as in the nature of a written agreement of contract, whose terms and conditions should not be allowed to fail of performance or execution by reason of the death of the Indian allottee or true owner. The provisions of the Puyallup Act (*supra*) appear to be sufficient to justify the course which the department has taken in this matter, to which special attention is invited, and to convey good title to lands sold thereunder."

Upon all the foregoing facts the court held that the plaintiff is the owner in fee simple of the premises in controversy; that the defendants have no interest therein, and that plaintiff's title should be quieted. Decree was entered accordingly, and Lillie and Ruther Jacobs and their guardian Wilcox, being the only answering defendants, have appealed.

The appellants to some extent discuss the nature of the estate taken by the grantees of the patent from the United States. Respondent concedes that they took a base or quali-

fied fee simple title subject to temporary restrictions on the
right of alienation, as held by this court concerning a similar
patent in *Guyatt v. Kautz*, 41 Wash. 115, 83 Pac. 9. It is
also conceded that the appellants, as heirs of the deceased
allottees, are entitled to their proportionate part of the pro-
ceeds of the sale. The essential question for determination is,
what was the nature and effect of the written consent executed
by the allottees and appointing the Indian commissioner to
sell the lands in controversy. If that consent was sufficient
authority for the sale, then the judgment of the trial court
was right, inasmuch as the respondent as purchaser and the
Indian commissioner and officers of the interior department
in all things appear to have acted in good faith, and no fraud
or collusion was practiced. The government was the volun-
tary donor of these lands, and as such it had the power to
place such restrictions upon the grant as it saw fit. *Smythe
v. Henry*, 41 Fed. 705; *Eells v. Ross*, 64 Fed. 417. Exercis-
ing that power, the patent issued for these lands absolutely
prohibited alienation for a longer term than two years. The
power to authorize further exercise of the right of alienation
was expressly prohibited even to the legislature of the future
state, without consent of Congress. The ultimate power to
confer the right of full alienation was reserved by the gov-
ernment in the grant itself, which, as we have seen, was made
in 1886. In pursuance of this reserved power, Congress after-
wards passed the aforesaid act of 1893, conferring the full
power of alienation and prescribing the method of its exercise.

As we understand the facts in this case, the method of
alienation prescribed by Congress has been pursued, unless
by reason of the death of Charley and Julia Jacobs, the con-
veyance was ineffectual. The initiatory step toward aliena-
tion prescribed by the act of Congress was the written consent
of the allottees. With that existing, the further details of
conveyances rested with the Indian commissioner and depart-
ment of the interior as prescribed. As we have seen, the writ-
ten consent of all the allottees named in this patent was duly
executed and delivered to the commissioner. Annie, the sister

of Charley, had died before the consent was given, but Charley as her sole heir executed the consent.

It is argued by appellants that the written consent had no further force than that of an ordinary naked power of attorney, and that inasmuch as Charley and Julia died after the consent was given and before the sale was made, the power was thereby annulled and the sale rendered void. The words "power of attorney" are not used in the act of Congress prescribing this method of alienation. The office of a power of attorney is well understood. If a mere power revocable at will or by death was what was intended, it would seem that the agreement for alienation would have been so defined. We think it manifest from the act itself that such was not intended. It plainly appears that the government recognized the fact that it had reserved the power to act as trustee for the Indians, so far as alienation was concerned, notwithstanding the allotment in severalty. The statute requires but one consent from an allottee, and it does not in terms require that when an allottee dies after consent is given and before sale, that his heirs must also consent. It empowers the commissioner to procure the appointment of guardians for minor heirs of deceased allottees, but that is manifestly for the purpose of effecting a proper distribution of the proceeds of a sale made in pursuance of a consent once duly given by the allottee himself. We think the consent intended by the act of Congress is in the nature of a contract to be carried out through the department of the interior for the benefit of the allottee and his heirs. The consent invokes as a finality the exercise of the reserved trust held by the government, and when given it is not revocable by death of the allottee, but continues in force as an incident to the exercise of the power reserved by the patent itself to the government. The government discharges this trust by completing the alienation of the lands as agreed by the allottees, and then distributes the proceeds to the allottees, or their heirs, if the allottees have in the meantime died.

As a matter of original construction, the act of Congress is easily susceptible of the above interpretation, and to us it seems to be a reasonable interpretation. We have also seen from the recital of the facts considered by the trial court that the department of the interior has in all its dealings with the Indians so construed the law. It is the general rule that, when a statute entrusts the carrying out of its provisions to the executive department, its interpretation by that department will be followed by the courts, unless there are cogent reasons to the contrary.

"The construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. . . . The officers concerned are usually able men and masters of the subject. Not unfrequently they are the draftsmen of the laws they are afterwards called upon to interpret." *United States v. Moore*, 95 U. S. 760, 24 L. Ed. 588.

The above statement embodies in a brief way the substance of the expressions of many courts whose opinions might be cited, and which are cited in respondent's brief. Their citation here, however, seems unnecessary, for the reason that this court has already several times applied the said rule of construction and recognized the wholesomeness thereof. *McSorely v. Hill*, 2 Wash. 638, 27 Pac. 552; *Keane v. Brygger*, 3 Wash. 338, 28 Pac. 653; *Blair v. Brown*, 17 Wash. 570, 50 Pac. 483, 61 Am. St. 927; *State ex rel. Smith v. Ross*, 42 Wash. 439, 85 Pac. 29.

Having in view our own construction as above set forth, and particularly in view of the construction placed upon the statute by the executive department, charged with carrying out its terms, we think the sale made by the Indian commissioner was duly authorized. It follows that the respondent's title should be quieted as against appellants.

The judgment is affirmed.

DUNBAR, RUDKIN, FULLERTON, MOUNT, CROW, and ROOT, JJ., concur.