## STARK *v.* STARRS.

1. Under the statute of Oregon which provides, that any person *in possession* of real property may maintain a suit in equity against another, who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest, a bill will not lie on a possession without some right, legal or equitable, first shown.

2. Under the act of Congress, of September 27th, 1850, "to create the office of surveyor-general of the public lands of Oregon" (the act commonly known as "The Oregon Donation Act," and stated fully in the case), the right of the claimant to a patent became perfected when the certificate of the surveyor-general, and accompanying proofs, were received by the commissioner of the general land office, and he found no valid objection thereto.

3. The act of August 14th, 1848, organizing the Territory of Oregon, which declared that all laws of the United States should be in force in the Territory, "*so far as the same, or any provision thereof, may be applicable,*" did not extend over the country any portion either of the general Pre-emption Act of September, 1841, or of the act of May 23d, 1844, commonly known as the "Town Site Act."

4. The right to a patent once vested is equivalent, as respects the government dealing with the public lands, to a patent issued. When issued, the patent, so far as may be necessary to cut off intervening claimants, relates back to the inception of the right of the patentee.

5. A patent issued to the corporate authorities of the city of Portland, in Oregon, in December, 1860, upon an entry made under the Town Site Act of May 23d, 1844, passed no title to the land covered by the donation claim of a person whose right to a patent was perfected previously to such entry, and whose claim was surveyed previously to the act of July 17th, 1854; by which the Town Site Act was extended, though with qualifications, to Oregon Territory.

ERROR to the Supreme Court of Oregon.

A. and L. Starr, asserting themselves to be owners in possession of certain parcels of land *in the city of Portland,* Oregon, and derived by title from that city, filed a bill in equity in one of the State courts of Oregon, to quiet their title to the land against an ownership set up to it by one Stark, and to have a patent for it which had issued to Stark surren-

dered.   The bill was founded on a statute of Oregon, which
provides that "any person in possession of real property
may maintain a suit in equity against another who claims an
estate or interest therein adverse to him, for the purpose of
determining such claim, estate, or interest."

The title which the bill asserted to be void, and which it
sought to have declared so, arose as follows:

. Previously to the treaty with Great Britain, of June 15th,
1846, by which the boundary line between the possessions
of that country and the United States, west of the Rocky
Mountains, was established, the region known as Oregon
was claimed by both countries; and the emigrants there
from the United States and from Great Britain held joint
possession of the country under the treaty between the two
nations, of October 20th, 1818, which was continued in force
by the convention of August 6th, 1827.

In 1845, the inhabitants of this Territory established a
provisional government for purposes of mutual protection,
and to secure peace and prosperity among themselves; and
they adopted laws and regulations for their government
until such time as the United States should extend their jur-
isdiction over them.

Under the provisional government each settler was enti-
tled to claim 640 acres of land, upon complying with certain
conditions of improvement, &c.

In 1848, Congress established the territorial government
of Oregon.*   The fourteenth section of the act which did
this, recognized and continued in force the laws adopted by
the provisional government, and declared that the laws of
the United States were extended over the Territory, " *so far
as the same, or any provision thereof, may be applicable;*" but
all laws granting or affecting lands were declared to be void.
And Congress itself soon afterwards passed an act on the
subject of titles.   The act of September 27th, 1850, com-
monly called the Donation Act of Oregon,† provided (§ 4),
that there should be granted to settlers or occupants of the

---

* 9 Stat. at Large, 323.                    † 9 Id. 496.

public lands, then residing in the said Territory, or who should become residents thereof on or before the first day of December, 1850, and who should have resided upon and cultivated the same for four consecutive years, and should otherwise conform to the provisions of the act, one-half section, or 320 acres of land, if a single man, and if married, or becoming married within one year from December 1st, 1850, one section, or 640 acres; *provided*, however, the donation should embrace the land actually occupied and cultivated by the settler on it.

The sixth section of this act required that the settler should notify to the surveyor-general the tract claimed under the law within three months after the survey had been made; and the seventh section provided, that within twelve months after the surveys had been made each person claiming a donation right under the act should *prove to the satisfaction of the surveyor-general,* the commencement of the settlement and cultivation required; and after the expiration of the four years from the date of such settlement, should prove, *in like manner,* by two disinterested witnesses, the continued residence and cultivation required by the fourth section of this act. The act went on:

"Upon such proof being made, the surveyor-general, or other officer appointed by law for that purpose, shall issue certificates, under such regulations as may be prescribed by the commissioner of the general land office, setting forth the facts in the case, and specifying the land. . . And the surveyor-general shall return the proof so taken, to the office of the commissioner of the general land office, and if the said commissioner shall find no valid objection thereto, patents shall issue for the land, according to the certificates aforesaid, upon the surrender thereof."

In professed accordance with these provisions, and the regulations made by the general land office, the defendant, in May, 1852, within three months after the survey of the land had been made, gave to the surveyor-general notice of the tract claimed by him, and within twelve months after the

survey proved, *to the satisfaction of the surveyor-general,* that the settlement and cultivation had been commenced on the 1st of September, 1849, and afterwards on the 10th of September, 1853, proved, in like manner, by two disinterested witnesses, the fact of his continued residence and cultivation for four years, which had previously expired; this having been done in the form and manner usual in the department.

In September, 1853, the surveyor-general issued to the party a donation certificate, reciting the claim of a donation right made by him to a tract of land described; that proof had been made to his satisfaction that the settlement was commenced on the 1st of September, 1849, four years previous to the date thereof, and that the fact of his continued residence and cultivation since that period had been established by two disinterested witnesses; and he forwarded the certificate to the commissioner of the general land office, accompanied by the proof of the facts recited, in order that a patent might issue to the claimant for the tract described, provided he found no valid objection thereto. No objection was found by the commissioner except a supposed application to the tract in question of an act of Congress of May 23d, 1844, commonly known as the Town Site Act, the nature of which will appear further on in stating the title on the other side, and which was relied on as in part making that title. The evidence of settlement, &c., was by him considered ample, and the certificate satisfactory; and a patent was issued thereon to Stark, the defendant.

Such was the title—a documentary one—sought to be put aside.

The documentary title of the Starrs, alleged by their bill to be superior to it, will be stated directly. Their bill not only, however, set up title in themselves, alleging it superior to the documentary title as presented by the other side, but it alleged that Stark had not made in point of fact any such settlement and cultivation as he had brought persons to swear to before the commissioner, and that the certificate on which he got this patent, was false, and his patent

consequently void. This was a question of fact on which evidence was taken. The answer denied the allegations thus made.

The documentary case of the Starrs was thus:

An act of Congress passed September 4th, 1841,* provides that every person who shall have made a settlement on the public lands " which have been or shall have been *surveyed* prior thereto," shall be authorized to enter any number of acres, not exceeding one hundred and sixty, upon paying the minimum price.

An act of May 23d, 1844, entitled " An act for the relief of .the citizens of *towns* upon the lands of the United States under certain circumstances"† (the act already mentioned as the Town Site Act), provides as follows:

" Whenever any portion of the *surveyed* public lands has been or shall be settled upon and occupied as a town site, and therefore not subject to entry under the existing pre-emption laws, it shall be lawful, in case such town shall be incorporated, for the corporate authorities . . . to enter at the proper land office and at the minimum price, the land so settled and occupied," &c.

On the 17th of July, 1854, Congress enacted that donations *thereafter to be surveyed in Oregon Territory*, claimed under the Donation Act of September 27th, 1850, should in no case include a town site or lands settled upon for purposes of business or trade and not for agriculture, and that all legal subdivisions included in whole or in part in such town sites or settled upon for purposes of business or trade and not for agriculture, should be subject to the operations of the Town Site Act of May 23d, 1844; whether such settlements were made before or after the surveys.

On the 1st of February, 1858, and while the claim of Stark was pending before the commissioner, the corporate authorities of the city of Portland made an entry under the Town Site Act of May 23d, 1844, of lands within the city limits to the extent of $307\frac{49}{100}$ acres, which included the premises in

* § 10; 5 Stat. at Large, 455.                        † 5 Id. 657.

controversy, in trust for the several use and benefit of the occupants thereof, and presented to the commissioner a certificate of the register of the land office, in Oregon, of their having made full payment for the same. The commissioner accordingly issued a patent to *them*.

The patent to the city authorities was dated 7th December, 1860; that to Stark the day following; it having been intended that they should be issued on the same day. Each contained reciprocal reservations in favor of the rights conveyed by the other.

The court in which the bill was filed, granted the relief prayed for, and the Supreme Court of the State of Oregon having affirmed their decree, the case was now here under the twenty-fifth section of the Judiciary Act.

*Messrs. M. Blair and F. A. Dick, for Stark, plaintiff in error :*

1. The patent to the city was absolutely void—the act of 1844, under which it issued, not being in force in Oregon until after July 17th, 1854. The act of 1844 is but amendatory of the pre-emption law of 1841, which contains the provision upon which the act of 1844 operates. It applies only to *surveyed* lands, which are excepted from operation of the pre-emption law. But the pre-emption law was not in force in Oregon in 1850. There were not only no *surveyed* lands there at that date, but Congress had, in the donation law of 1850, made more liberal provision for settlers than even by the pre-emption act. The law of 1844 was inapplicable, from the condition of things in Oregon when the act of 1848, establishing the territorial government, or when the donation law of 1850, was passed.

2. If the Town Site Act was not in force in Oregon in 1853, the patent to the authorities of Portland is a nullity, and the defendants in error have no title of any description of which a court of justice can take cognizance. Mere possession of public land will not enable the party to maintain a suit against any one, especially not against persons holding possession under title derived from the proper officers of the government. The patent to Stark and the regularity of pro-

ceedings. preliminary to it cannot, therefore, be here called in question.*

3. In this view we need not discuss the issue of fact.

*Mr. Wills, contra:*

1. This is a suit *in equity* to quiet title, brought under a statute which allows any person *in possession* to maintain such a suit. Under any circumstances of *title*, the Starrs being in possession may maintain it.

2. Was the Town Site Act of 1844 in force in Oregon prior to the enactment of the donation law of 1850, by virtue of the fourteenth section of the act of August 14th, 1848, organizing the Territory of Oregon?

Unless the land laws of the United States, including the Town Site Act, were extended by the act to the Territory of Oregon, we have this anomaly, that by this law all land titles then existing were made null, and in a law organizing that Territory and providing for its settlement no means were provided whereby incipient title to lands could be acquired from the United States, their sole proprietor. The land laws of the United States in themselves, were as applicable to Oregon as to any other Territory of the United States; and that they were *needed* is demonstrated by the fact, that no other means was provided whereby title to land could be acquired in the Territory.

3. But if the Town Site Act was not extended to Oregon before the passage of the act of July 17th, 1854, certainly it was in force *after* the date of that law. Both patents were issued *after* the passage of that act, and at a time when the operation of the Town Site Act in that Territory cannot be disputed. If, then, Stark had not complied with the terms of the Donation Act, under which his patent was issued, it was void as against the prior patent issued to the city of Portland, under the act of 1844, at a time when the latter

---

* Burgess *v.* Gray, 16 Howard, 65; Wilcox *v.* Jackson, 13 Peters, 511; Miller *v.* Kerr, 7 Wheaton, 1; Patterson *v.* Winn, 11 Id. 384; Polk's Lessee *v.* Wendell, 9 Cranch, 99; Bodley *v.* Taylor, 5 Id. 191; Easton *v.* Salisbury, 21 Howard, 426.

act was in force. This leads to the question of fact in the case. Our right in an equity proceeding, to go behind the patent and make the inquiry, is settled by numerous cases, especially by *Garland* v. *Wynn*,[*] and *Lindsey* v. *Hawes*.[†]

[The counsel then argued the point of fact on the evidence; a matter, however, which the court did not reach in its opinion, the case being decided on the other ground.]

Mr. Justice FIELD delivered the opinion of the court.

This is a suit in equity to quiet the title of the plaintiff to certain parcels of land situated in the city of Portland, in the State of Oregon. It is founded upon a statute of that State which provides that "any person in possession of real property may maintain a suit in equity against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest." This statute confers a jurisdiction beyond that ordinarily exercised by courts of equity, to afford relief in the quieting of title and possession of real property. By the ordinary jurisdiction of those courts a suit would not lie for that purpose, unless the possession of the plaintiff had been previously disturbed by legal proceedings on the part of the defendant, and the right of the plaintiff had been sustained by successive judgments in his favor.[‡]

The equity asserted in such cases had its origin in the prolonged litigation which the action of ejectment permitted. That action being founded upon a fictitious demise between fictitious parties, a recovery therein constituted no bar to a second similar action, or to any number of similar actions for the same premises. With slight changes in these fictions a new action might be instituted and conducted as though no previous action had ever been commenced. Thus the party in possession, though successful in every case, might

---

[*] 20 Howard, 6.

[†] 2 Black, 554; and see State of Minnesota *v.* Bachelder, 1 Wallace, 111 115.

[‡] Shepley *v.* Rangely, Davies, 242; Devonsher *v.* Newenham, 2 Schoales & Lefroy, 208; Curtis *v.* Sutter, 15 California, 257.

be harassed if not ruined by the continued litigation. To prevent such litigation, after one or more trials, and to secure peace to the party in possession, courts of equity interposed upon proper application and terminated the controversy.

By the statute in question it is unnecessary in order to obtain this interposition of equity for the party in possession to delay his suit until his possession has been disturbed by legal proceedings, and judgment in those proceedings has passed in his favor. It is sufficient that a party out of possession claims an estate or interest in the property adverse to him. He can then at once commence his suit, and require the nature and character of such adverse estate or interest to be set forth and subjected to judicial investigation and determination, and that the right of possession as between him and the claimant shall be forever quieted.

We do not, however, understand that the mere naked possession of the plaintiff is sufficient to authorize him to institute the suit, and require an exhibition of the estate of the adverse claimant, though the language of the statute is that " any person in possession, by himself or his tenant, may maintain " the suit. His possession must be accompanied with a claim of right, that is, must be founded upon title, legal or equitable, and such claim or title must be exhibited by the proofs, and, perhaps, in the pleadings also, before the adverse claimant can be required to produce the evidence upon which he rests his claim of an adverse estate or interest.

In this case the plaintiff asserts title to the premises in dispute under a patent of the United States, bearing date on the 7th day of December, 1860, purporting to be issued to the corporate authorities of the city of Portland, under the Town Site Act of Congress of May 23d, 1844, entitled " An act for the relief of the citizens of towns upon the lands of the United States under certain circumstances;"* and the defendant claims title to the premises under a patent of the United States, bearing date on the 8th day of December, 1860, purporting to be issued to him under the Donation Act

---

* 5 Stat. at Large, 657

of September 27th, 1850, entitled "An act to create the office of surveyor-general of the public lands of Oregon, and to provide for the survey and to make donations to the settlers of the said public lands."*

By the fourth section of this Donation Act, a grant was made to every white settler or occupant of public land in Oregon, above the age of eighteen years—who was a citizen of the United States, or had made a declaration according to law of his intention to become a citizen, or should make such declaration on or before the 1st day of December, 1851, and who was at the time a resident of the territory, or might become a resident on or before the 1st of December, 1850, and who should reside upon and cultivate the land for four consecutive years, and otherwise conform to the provisions of the act—of three hundred and twenty acres of land, if a single man, or if a married man, or if he should become married within a year from the 1st of said December, then six hundred and forty acres, one-half to himself and the other half to his wife, to be held by her in her own right; the donation in all cases to embrace the land actually occupied and cultivated by the settler.

By the sixth section, the settler was required, within three months after the survey of the land was made, to notify to the surveyor-general of the United States the tract claimed by him under the act. By the seventh section any person claiming a donation right was required, within twelve months after the survey was made, or where the survey was made before the settlement, then within that period after the settlement commenced, "to prove to the satisfaction of the surveyor-general," or of such other officer as might be appointed by law for that purpose, the commencement of the settlement and cultivation required by the act, and after the expiration of four years from the date of such settlement, to prove in like manner, by two disinterested witnesses, the continued residence and cultivation required by the fourth section. And the act declared that upon such proof being made the

---

* 9 Stat. at Large, 496.

surveyor-general, or other officer appointed by law for that purpose, should issue certificates, under such rules and regulations as might be prescribed by the commissioner of the general land office, setting forth the facts and specifying the land to which the parties were entitled; and that the surveyor-general should return the proof thus taken to the office of the commissioner of the general land office, and if the commissioner should find no valid objection thereto, patents should issue for the land according to the certificates, upon their surrender.

In pursuance of these provisions, and the regulations made by the general land office to carry the act into effect, the defendant, in May, 1852, within three months after the survey of the land had been made, gave to the surveyor-general notice of the tract claimed by him, and within twelve months after the survey proved, to the satisfaction of the surveyor-general, that the settlement and cultivation had been commenced on the 1st of September, 1849, and afterwards on the 10th of September, 1853, proved by two disinterested witnesses the fact of his continued residence upon and cultivation of the same for four consecutive years, which had then expired.

On the completion of this latter proof, on the 10th of September, 1853, the surveyor-general issued the required certificate, reciting therein the claim of a donation right made by Stark to a certain described tract of land; that proof had been made to his satisfaction that the settlement of Stark was commenced on the 1st of September, 1849, four years previous to the date thereof, and that the fact of his continued residence and cultivation since that period had been established by two disinterested witnesses; and he forwarded the certificate to the commissioner of the general land office, accompanied by the proof of the facts recited, in order that a patent might issue to the claimant for the tract described, if he found no valid objection thereto. No objection was found by him except such as arose from the supposed application to the tract in question of the Town-Site Act of May 23d, 1844, which we shall presently examine. The evidence was con-

sidered ample and the certificate satisfactory; and on the 8th of December, 1860, a patent was issued thereon to the defendant.

At the outset, however, the commissioner objected to the issue of this patent upon the ground that the land was brought under the operation of the Town Site Act by the organic law of August 14th, 1848, establishing the territorial government of Oregon, and was not subject to disposition under the Donation Act of 1850. And whilst the claim of Stark for a patent was pending before him, the corporate authorities of the city of Portland made an entry of the lands within the city limits to the extent of three hundred and seven acres and forty-nine hundredths of an acre, which included the premises in controversy, in trust for the several use and benefit of the occupants thereof, and presented to the commissioner a certificate of the register of the land office, in Oregon, of their having made full payment for the same. The commissioner accordingly issued a patent to them bearing date on the 7th of December, 1860, reserving, however, from its operation, any valid claims which might exist in virtue of the several donations to Stark and others.

The patent to Stark bearing date on the following day contains a reservation of a similar character in favor of the city of Portland. It grants the land subject to such rights as might exist in virtue of the entry by the city.

It was the intention of the commissioner of the general land office, and it was so directed by him, that the two patents should bear even date and be issued simultaneously. The omission to comply with his direction in this particular is, however, immaterial, for if the Town Site Act was not in force in Oregon before the right of Stark to a patent of his donation claim became perfected, the reservation of the patent was inoperative and void. That right became perfected when the certificate of the surveyor-general and accompanying proofs were received by the commissioner of the general land office, and he found no valid objection to them. That is to say, if the Donation Act of 1850 was applicable to the lands, his right to a patent became perfect

when the certificate of the surveyor and accompanying proof·
showed, in the judgment of the commissioner, a compliance
with its requirements.   That they were satisfactory to his
judgment in this respect follows from the subsequent issue
by him of the patent.   His objection to the patent, as we
have already said, arose, not from any defect in the certifi-
cate or proof, but from an opinion that the lands were ¦sub-
ject to the provisions of the Town Site Act of 1844.   That he
was mistaken in this opinion we are entirely satisfied.   The
act of 1844 is only a part of the general land system of the·
United States, and is supplementary to the General Pre-emp-
tion Act of September, 1841.   The act of 1841 confers the
right of pre-emption upon individual settlers, reserving,
however, from entry by them all lands selected as town
sites; the act of 1844 allows the entry of lands thus selected
to be made, if the town is incorporated, by the corporate
authorities, and if not incorporated, by the judges of the
county in which the town is situated; the entry to be made
in trust for the several use and benefit of the occupants.
Both acts limit the right of entry to *surveyed* lands.   Neither
individual nor city could claim this right with respect to any
lands until they had been surveyed by the officers of the gov-
ernment.   Every person, says the act of 1841, who shall
make a settlement on the public lands " which have been,
or shall have been *surveyed* prior thereto," shall be authorized
to enter any number of acres, not exceeding one hundred
and sixty, upon paying the minimum price.

  "Whenever any portion of the *surveyed* public lands,"
reads the act of 1844, " has been or shall be settled upon
and occupied as· a town site, and therefore not subject to
entry under the existing pre-emption laws, it shall be lawful,
in case such town shall be incorporated, for the corporate
authorities, and if not incorporated, for the judges of the
county in which such town may be situated, to enter at the
proper land office and at the minimum price, the land so
settled and occupied," &c.

  It is not pretended that any public surveys had been ex-
tended over Oregon previous to the act of 1850, or were ever

authorized by the government. There were, therefore, no surveyed lands of which any entry could be made either by an individual or by any corporate authorities. The laws of Congress relating to pre-emption by individuals or entries by municipal authorities had, therefore, no application to the condition of things in Oregon at that time. The act of August 14th, 1848, organizing the Territory of Oregon, which declared that all laws of the United States should be in force in the territory, " *so far as the same, or any provision thereof, may be applicable,*" did not extend over the country any portion either of the act of 1841 or of the act of 1844.*

" It is well known," says Mr. Justice Deady of the United States District Court of Oregon, in considering this subject, in *Lownsdale* v. *The City of Portland,* " that at the time of the organization of Oregon Territory an anomalous state of things existed here. The country was extensively settled, and the people were living under an independent government, established by themselves. They were a community, in the full sense of the word, engaged in agriculture, trade, commerce, and the mechanic arts; had built towns, opened and improved farms, established highways, passed revenue laws and collected taxes, made war and concluded peace. As a necessity of their condition, and the corner-stone of their government and social fabric, they had established a 'land law' regulating the possession and occupation of the soil among themselves. That all this was well known to Congress at the time of the passage of the act of 1848, would be highly probable from its historic importance, and is certain to have been so from the language of the act itself."†

" The leading feature of the land law of the provisional government was that which provided that every male inhabitant of the country, over a certain age, should hold and possess 640 acres of land. The uses that the land might be put to were immaterial. The occupant might cultivate, pasture it, or, if he possessed a good site, and had the thrift and

---

* 9 Stat. at Large, 323, § 14.
† See sections 14 and 17 of the act of 1848.

enterprise, he might build a town upon it. In the disposition of the public lands this state of things called for peculiar legislation different *in toto* from that required in an unsettled country. Under these circumstances is it to be presumed that the act of 1844—an obscure and special provision of the then existing land system of the United States—was extended over this country, and the general provisions of the same contained in the Pre-emption Act of 1841 left behind? Nothing can be more unreasonable. It would tax the ingenuity of man to find a provision in the land system of the United States, as it stood in 1848, less applicable to the condition of the country, or that would have worked greater hardship, confusion and injustice than the act of 1844."*

The act of Congress of September 28th, 1850, "to provide for extending the laws and the judicial system of the United States to the State of California," declared, "that all the laws of the United States, *not locally inapplicable*," should have the same force and effect within that State as elsewhere in the United States, yet it was never supposed that this provision had the effect of extending over the State any portion of the land system of the United States in advance of the public surveys, upon which that system rested, and without which, as the law then stood, that system was inoperative.† But, on the contrary, on the 3d of March, 1853, Congress, by special act, provided for the survey of the public lands in that State, and made them, so far as individual pre-emption was concerned, with some exceptions, subject to the act of 1841; and when occupied as towns or villages, except when located on or near mineral lands, subject to the provisions of the act of 1844.‡ This special legislation, with the exception of a few particulars, would have been unnecessary had those laws been extended over the State by force of the act of September 28th, 1850. So, too, the acts organizing the Territories of New Mexico. Kansas, and Nebraska, contained similar provisions, and extended the laws of the United States over them, so far as

---

* 1 Oregon, 391.        † 9 Stat. at Large, 521.        ‡ 10 Id. 244.

they were not locally inapplicable; yet subsequent special legislation was deemed necessary to extend any portion of the public land system over them.*

The Donation Act of 1850 is of itself evidence that Congress did not then consider the acts of 1841 or 1844 applicable to Oregon. That law established no system of preemption, nor recognized any such system as having been previously in existence in the Territory. It substantially gave to every settler, upon certain conditions, the land which he occupied, excepting only mineral and saline lands, and such parcels as might be reserved by the President for forts, arsenals, and other public uses. The law, as well observes Mr. Justice Deady, in the able opinion from which we have already cited, "was a system complete within itself, and admirably adapted to the condition of the people and the country as it found them," and was "a practical recognition and confirmation of the land law of the provisional government."

A similar view of the subject was taken by the Supreme Court of the State, after full examination, in the case of *Marlin* v. *T' Vault.†* That court concludes a well-considered opinion by stating that the people of the State had universally acted upon the belief that the act of 1844 was not in force there, and that the effect of a contrary rule would be to unsettle rights, and strike a blow at the prosperity of nearly every town in Oregon.

We are clear that the Town Site Act of 1844 was not extended to Oregon until the 17th of July, 1854; and even then that it only operated to exclude lands occupied as town sites, or settled upon for purposes of business or trade, from a donation claim, which had not been previously surveyed.‡ Before the passage of this act the claim of the defendant, Stark, had been surveyed, and the required proof of his settlement and continued occupation and residence made, and such steps had been taken as to perfect his right to a patent.

---

* 9 Stat. at Large, 452, § 17; 10 Id. 277, § 32.

† 1 Oregon, 77.                    ‡ 10 Stat. at Large, 305, § 1.

The lands embraced by his claim had then ceased to be the subject of purchase from the United States by any person, natural or artificial. The right to a patent once vested is treated by the government, when dealing with the public lands, as equivalent to a patent issued. When, in fact, the patent does issue, it relates back to the inception of the right of the patentee, so far as it may be necessary, to cut off intervening claimants.

It follows, from the views expressed, that the plaintiff derived no title or estate in the premises in dispute by force of the patent to the corporate authorities of the city of Portland. Although there was at the commencement of this suit no legislation by the State of Oregon for the execution of the trust, to which the act of 1844 contemplates that municipal authorities in receiving a patent shall be subjected, we have considered the case as though the trust had been executed, and the plaintiff, as one of the beneficiaries, had become invested with all the estate and right the authorities could possibly impart. Those authorities not having received any title or estate in the premises in controversy, could, of course, impart none to the plaintiff. His position is, therefore, reduced to that of a mere possessor without title. Such possession is entirely insufficient to justify the interposition of equity for the determination of the defendant's title, even under the very liberal act of Oregon. The plaintiff must first show in himself some right, legal or equitable, in the premises before he can call in question the validity of the title of the defendant.

This case differs very materially from that of *Garland v. Wynn*,* or that of *Lindsay* v. *Hawes*,† and other cases to which the counsel of the plaintiff has referred. In *Garland v. Wynn* there had been a conflict between two claimants of a right of pre-emption to the same land under different statutes. The register and receiver of the local land office decided in favor of the assignor of Garland, and gave him a patent certificate. The commissioner of the general land

---

* 20 Heward, 6.          † 2 Black, 554.

office approved of the decision, and issued the patent to Garland. Wynn, the other claimant, whose entry was the oldest, and had been once allowed, thereupon filed his bill in equity, asserting his prior right to the land and his equitable title to the patent. The Supreme Court of Arkansas sustained the bill, and ordered the patentee to execute a conveyance of the land to the complainant, and on appeal this court affirmed the decision.

In *Lindsay* v. *Hawes*, the ancestor of the complainant had obtained a pre-emption right to the land in dispute, and received a patent certificate for the same. Some years afterwards the defendant, Hawes, claimed a like pre-emption right to the land, and received a similar certificate, upon which a patent was issued to him. The suit was brought by the heirs of the first pre-emptor to compel a conveyance of the legal title acquired by the patent from the patentee, and parties claiming under him with notice. This court held that the first pre-emptor had acquired the better right to the land, and was therefore entitled to a conveyance of the legal title.

These are only applications of the well-established doctrine that where one party has acquired the legal title to property to which another has the better right, a court of equity will convert him into a trustee of the true owner, and compel him to convey the legal title. The same observation will apply to the other cases cited by counsel. They have no pertinency to the case at bar, for here no prior or better right to the land in dispute is shown in the plaintiff.

The view we have taken has rendered it unnecessary to look into the evidence embodied in the record respecting the original settlement and residence of the defendant, or to consider how far it impeaches the proof presented by him to the surveyor-general in support of his donation claim.

The decree of the Supreme Court of Oregon must be REVERSED, and that court instructed to enter a decree directing the Circuit Court to dismiss the suit; and it is

So ORDERED.