KRAUS et al. v. CONGDON et ux.

(Circuit Court of Appeals, Ninth Circuit.   March 7, 1908.)

No. 1,474.

1. TAXATION—ACTION TO RECOVER LAND SOLD FOR TAXES—LIMITATION UNDER WASHINGTON STATUTE.

Code Wash. 1881, § 2939, limiting the time for bringing suits to recover lands sold for taxes to three years, was a part of Act Dec. 1, 1881, "to provide for the assessment and collection of county and territorial revenue," and was repealed by Act March 15, 1893, p. 385, c. 124, § 137, which expressly repeals "all acts and parts of acts heretofore enacted by the Legislature of the territory or state of Washington providing for the assessment and collection of taxes in this state."

2. SAME—PLEADING—ADMISSIONS IN BILL.

In a bill to set aside a tax title, which sets out the proceedings for selling the property, and alleges their invalidity, a statement that a deed was issued, "whereby and by the terms of which said county treasurer granted and conveyed" the property to the grantee, cannot be construed as an admission that the title passed by such deed.

3. SAME—RIGHT TO MAINTAIN.

In a suit under Ballinger's Ann. Codes & St. Wash. § 5521 (Pierce's Code, § 1156), by one in possession of lands, to set aside a tax title thereon, plaintiff is not required to plead title in himself, nor to prove it even if alleged.

4. TRESPASS—TITLE TO SUPPORT ACTION—TAX TITLE—CONSTRUCTIVE POSSESSION BY PURCHASER.

An invalid tax deed does not give the holder constructive possession of the property, so as to render another who enters upon and takes actual possession of it a trespasser, nor does the continued payment of taxes thereon by the holder of such deed.

5. QUIETING TITLE—SUIT UNDER WASHINGTON STATUTE—POSSESSION TO SUPPORT.

Under Ballinger's Ann. Codes & St. Wash. § 5521 (Pierce's Code, § 1156), which authorizes any one in possession of real property to maintain a suit to determine an adverse claim thereto, it is immaterial that possession was taken for the purpose of instituting the suit, if it was not tortious or in violation of the prior possession of another.

6. COURTS—FEDERAL COURTS—ENFORCEMENT OF REMEDY GIVEN BY STATE STATUTE.

A right given by a state statute to one in possession to maintain a suit to quiet title may be enforced in the federal courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, §§ 972, 973.

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

Ross, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Southern Division of the Eastern District of Washington.

Fred Parker, for appellants.

E. B. Preble and A. L. Agatin, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. As the facts in this case are set forth in the dissenting opinion in this case, it is unnecessary to state them here. It is not contended in this court that a valid tax title to the premises in controversy was ever acquired by the appellants, but it is urged that the court below erred in ruling that the suit was not barred by that provision of the act of the Legislature of Washington, approved Dec. 1, 1881, which was embodied in the Code of that year as section 2939. That section provides as follows:

"Any suit or proceeding for the recovery of lands sold for taxes, except in cases when the taxes have been paid or the land redeemed as provided by law, shall be commenced within three years from the time of recording the tax deed of sale, and not thereafter, except by the purchaser at the tax sale."

We think there can be no doubt that this provision of the statutes has been repealed. When adopted, it was a part of an act entitled "an act to provide for the assessment and collection of county and territorial revenue," which purported to be a complete system of taxation. A new revenue act and system of taxation went into effect on March 15, 1893, p. 385, c. 124, § 137, of which provides:

"All acts and parts of acts heretofore enacted by the Legislature of the territory or state of Washington, providing for the assessment and collection of taxes in this state, shall be, and the same are, hereby repealed."

Section 2939 of the Code of 1881 was a part of the revenue act of that year, which provided for the assessment and collection of taxes. Being a part of that act, it is repealed by the subsequent act of 1893. The Supreme Court of Washington so construed the law in an analogous case. Tacoma School Dist. v. Hedges, 13 Wash. 69, 42 Pac. 522.

Should the demurrer to the bill of complaint have been sustained on the ground that the appellees made contradictory allegations therein as to the title, and in substance admitted the title to be in the appellants? We find no ground for so holding. The bill alleged title in fee and possession of the premises in the appellees, the delinquency of taxes on said property, the entry of a pretended judgment and lien for the unpaid taxes, the sale under the pretended judgment, and the purchase thereof by one of the appellants, and the execution of a tax deed to such purchaser, and then set forth the defects in the tax proceedings, which show on their face the invalidity of the title thereby attempted to be acquired. It alleged that, by reason of these defects so set forth, the tax deed under which the appellants claim is and was wholly void and of no effect, and the prayer was that it be so adjudged and decreed by the court. These allegations are not contradicted by the language of the eighth paragraph of the bill, in which, in describing the conveyance made to the defendants, it is alleged that a tax deed was issued bearing date May 18, 1901, "whereby and

by the terms of which, said county treasurer granted and conveyed unto said Charles F. Kraus, his heirs and assigns, the real estate and premises aforesaid, which said deed was in the form prescribed by law and purported to have been given pursuant to the aforesaid judgment." It is clear that the pleader intended to, and did, by this allegation describe only the purport and tenor of the conveyance. It is true that, by the terms of that deed, so far as its mere terms are concerned, the county treasurer granted the described property to Kraus, and his heirs and assigns; but it does not follow that by so stating the appellees alleged that title passed thereby. On the contrary, the bill distinctly alleged that title did not pass thereby. Such was the understanding of the pleading by court and counsel in the court below. Counsel for the appellants accepted the bill as sufficient in that respect, and they make no contention in this court, and we may presume that none was made in the trial court, that the appellees had alleged the title to be in the appellants. There was a demurrer, on the ground that it appeared from the bill that the complainants therein had no title to the property; but that was based solely on the contention that the defects in the tax proceedings as set forth were not such as to invalidate the alleged tax title. It has not occurred to the ingenuity of counsel for the appellants to contend that the eighth paragraph of the bill expressly alleged the title to be in them.

The appellants earnestly contend that the trial court erred in holding that the appellees had an interest in the subject-matter of the suit such as to authorize them to maintain the suit. The bill alleged that the appellees were the owners in fee, and were in the possession of the premises in controversy. On the trial they produced no proof of their title. The statute under which this suit was brought does not require that the plaintiff shall have the title or any interest in the property. "Where the statute authorizes any one in possession to maintain the suit, mere possession without title is sufficient to maintain it as against a trespasser or one who establishes no title in himself." 17 Ency. of Pleading & Practice, 314; Gillis v. Downey, 85 Fed. 483, 488, 29 C. C. A. 286; Durell v. Abbott, 6 Wyo. 265, 44 Pac. 647; Scorpion v. Marsano, 10 Nev. 370; Calderwood v. Brooks, 45 Cal. 519. Since they were not required to plead the title, the appellees were not obliged to offer proof of title when they had pleaded it. Wilder v. City of St. Paul, 12 Minn. 192 (Gil. 116).

We find no ground for the assumption that the appellees were trespassers, or that their possession was obtained by fraud, collusion, or other wrong. There is nowhere in the record any suggestion of fraud or collusion. In order to make their entry a trespass, there must have been possession at the time in the appellants; for it is a well-settled rule that in order to maintain trespass quare clausum fregit, there must be either actual possession in the plaintiff at the time of the trespass, or a constructive possession based upon the legal title. Actual and constructive possession are the only forms of possession known to the law. Constructive possession, or legal possession as it is sometimes called, is that possession which the law imputes to the holder of the paramount title to unoccupied land. 28 Ency. of Law, 239. Simmons Creek Coal Co. v. Doran, 142 U. S. 442, 12 Sup. Ct.

239, 35 L. Ed. 1063. The defendants clearly had no constructive possession, because they had not the legal title. There is no such thing as constructive possession based on color of title. Had they the actual possession? The appellants in their brief admit that the lots were "vacant, and not occupied by any one," and that there were no improvements thereon. The utmost of their contention in that regard is that they claimed the lots and had paid the taxes thereon. Their mere claim of ownership was no act of possession, and the same is true of their payment of the taxes. "The payment of taxes upon land does not constitute actual possession of it" (1 Cyc. 992), and the weight of authority is that the payment of taxes is not even to be regarded as a circumstance to be considered with other facts as proof of possession (Id., and cases there cited).

The question here is not what motive had the appellees in entering into possession, but what rights of the appellants were invaded thereby. It is immaterial that the possession was taken for the purpose of instituting the suit, so long as the appellees did not act tortiously or disturb a prior possession in another. Apperson v. Allen. 42 Mo. App. 539. The Supreme Court of the state of Washington has held that, under the statute, possession is sufficient to warrant the action to quiet title. Bird v. Winyer, 24 Wash. 276, 64 Pac. 178; Shelton Logging Co. v. Gosser, 26 Wash. 126, 66 Pac. 151. The case last cited was decided on the averments of the complaint. The plaintiff therein, instead of simply alleging title and possession, proceeded to set up the source and deraignment of its title. It was held that, inasmuch as the plaintiff had set out the nature of its claim of title, the court was called upon to pass on the question whether it had title, and found that it had none. But the court said: "We understand the rule to be that, in the absence of any showing to the contrary, possession, as a matter of evidence prima facie. establishes title"—and further said: "It may be that all that the appellant was required to do to make out a prima facie case was to establish possession."

A right so created by a state statute and interpreted by state courts will be enforced in the federal courts in the same manner in which other equitable rights of parties will be enforced. In Central Pac. R. Co. v. Dyer, 1 Sawy. 641. Fed. Cas. No. 2,552, Field, Circuit Justice, held that the statute of Nevada, identical with that of Washington, enlarges the class of cases in which the jurisdiction of equity was formerly exercised in quieting title, and that the right thereby created would be enforced in the national courts. In Holland v. Challen, 110 U. S. 15, 3 Sup. Ct. 495, 28 L. Ed. 52, it was held that a statute of Nebraska, giving a right to one, whether in possession or not, claiming the title to real estate against any person or persons who claimed an adverse estate therein, to quiet the title thereto, created an enlargement of equitable rights, which may be administered in the federal courts as well as in the courts of the state.

The decree is affirmed.

ROSS, Circuit Judge (dissenting). The appellees filed in the court below a bill against Charles F. Kraus, Ethel Kraus, his wife, and

Ada Maud Kraus, to quiet their alleged title to three certain, separate, and distinct, but adjoining lots of land, known and described as lots 1, 2, and 3 of block 231, in the city of North Yakima, state of Washington. In their bill it is expressly alleged that on the 31st day of January, 1898, certain taxes, that had theretofore been levied upon each of the lots, became a lien thereon for a certain specified sum; and, remaining unpaid for the years 1891 to 1895, inclusive, there was on said 31st day of January, 1898, duly issued, under and in pursuance of the tax laws of the state then in force, certain certificates of delinquency, covering each of the lots, by virtue of which the county treasurer "duly sold, assigned, transferred, and set over unto the county of Yakima or its assigns, the lien of the state of Washington, of the county of Yakima, in and to each of said lots, respectively, and that the amount for which each of said certificates of delinquency was thus issued to said county on said day by said treasurer was respectively the sum of $27.68, and for no other or different sum, the same being the full amount due for all taxes and interest on each of said lots, and remaining unpaid and delinquent for the aforesaid years, 1891 to 1895, inclusive."

The bill further expressly alleges that thereafter, and on the 1st day of February, 1901, for the stated consideration of $27.68, principal, and $12.48, interest, the said county treasurer, by an instrument in writing bearing that date, duly sold and assigned, to the defendant Charles Kraus, each of the said certificates of delinquency, upon which he, on the 15th day of February, 1901, commenced suit in the superior court of the state in and for Yakima county, against one W. N. Pratt, to foreclose his lien upon each of said lots, in which action a "pretended" judgment was given and entered May 2, 1901, "whereby it was, among other things, adjudged and decreed that said Charles F. Kraus had a good and lawful lien against said lots of land for the following sums, to wit: The sum of $68.01 against lot 1, the sum of $67.44 against lot 2, and the sum of $67.45 against lot 3, which said amounts, respectively, were adjudged to be several judgments against said lots of land, and said judgment further directing and ordering the county treasurer of said county to sell, according to law, the premises aforesaid, or so much thereof as might be necessary to satisfy the judgment, with interest and costs." The bill further expressly alleges that thereafter, and on the 18th day of May, 1901, the county treasurer, acting under and by virtue of the "pretended" judgment, proceeded to sell, and—

"did sell, at public auction each of said lots, respectively, and that each of said lots was bid in and struck off to said Charles F. Kraus, for the following amounts, respectively, to wit: Lot 1 for $68.01; lot 2 for $67.44, and lot 3 for $67.45. That thereupon, and on the 18th day of May, 1901, the aforesaid county treasurer issued and delivered to said Charles F. Kraus, under the provisions of the tax laws of the state of Washington, in such case made and provided, a tax deed bearing date on said May 18, 1901, whereby and by the terms of which said county treasurer granted and conveyed unto said Charles F. Kraus, his heirs and assigns, the real estate and premises aforesaid, which said deed was in the form prescribed by law, and purported to have been given pursuant to the aforesaid judgment of superior court of Yakima county, made and entered on May 2, 1901, and the statute in such case made and provided, which said deed was thereafter, and on the same day, duly

recorded in the office of the auditor of said county, in Book 7 of Deeds on page 5. That by force of the provisions of the tax laws of the state of Washington the tax deed so made is intended to vest in the grantee, his heirs and assigns, the title to the property therein described, without further acknowledgment or evidence of such conveyance. That after the execution and delivery of said tax deed, and on or about the 24th day of May, 1901, the said defendant Charles F. Kraus (and) his wife, by deed of conveyance bearing said date, conveyed to the defendant Ada Maud Kraus, lot 1 in said block 231, and that the only title or estate which said Charles F. Kraus and wife had in or to said lot was founded and predicated upon the aforesaid tax deed and tax judgment sale, and not otherwise, and that said Ada Maud Kraus claims no title to said lot from any source other than as aforesaid, and that said defendants Charles F. Kraus and Ethel Kraus, his wife, neither have nor claim any right, title, or interest in and to said lots 2 and 3, except by virtue of the tax deed and sale as aforesaid."

The bill proceeds further, and sets out in full the summons issued in the suit brought by Kraus to foreclose the tax liens, and the affidavit for its publication, and then alleges that the affidavit was insufficient to justify the publication of summons, that the summons itself was insufficient, and that the judgment was and is void for various reasons stated in the bill.

The defendants demurred to the bill on the grounds that it appears from the bill itself that the complainants have no interest in the subject-matter of it; that they are not entitled to the relief sought, or to any relief, and that it appears from the bill itself that the cause of action, if the complainants ever had any, is barred by the statute of limitations of the state of Washington. The demurrer was overruled by the trial court; and, the defendants standing upon their demurrer, an order was entered to the effect that a decree be taken pro confesso against each of the defendants. This order was subsequently set aside in so far as it concerned the defendant Ada Maud Kraus, who was a minor, and for whom a guardian ad litem had been appointed. The minor by her guardian ad litem subsequently filed an answer, and the suit as to her came on for trial on its merits. And this was the entire evidence introduced on the part of the complainants to sustain their alleged title:

The judgment roll in the suit of Charles F. Kraus against W. N. Pratt, the deed of May 18, 1901, by the treasurer of Yakima county to Charles F. Kraus for the three lots in question, the deed of May 24, 1901, from Charles F. Kraus and his wife, Ethel Kraus, to Ada Maud Kraus for lot 1 of block 231, and the following witnesses: Allen S. Davis, whose testimony was only to the effect that he was present on the 17th day of February, 1906, and saw E. B. Preble tender to the minor defendant, on behalf of the complainant Chester A. Congdon, $140.15 for the taxes, penalties, and interest that had accrued on the lot covered by the deed to her, to wit, lot 1 of block 231. Next, Albert S. Congdon, a brother of the complainant Chester A. Congdon, testified to the effect that he had resided in North Yakima for eight years, during which time he knew the lots of land in question, and the defendant Charles F. Kraus; that he, the witness, was then engaged in the real estate business, and knew the value of the lots in question; that lot 1 was worth a little over $5,000, and the three lots

the aggregate amount of $15,000. This witness was then questioned, and answered on direct examination as follows:

"Q. On the 17th of February, 1906, at the time of the commencement of this suit, who was in possession of said lots 1, 2, and 3 in block 231? A. I don't know the date the action was commenced. We took possession after the fence was built, and have ever since; but whether that was on the 17th of February, 1906, I don't remember. Prior to that time, I suppose Mr. Kraus was in possession. I and Preble, acting in employ of defendant (complainant) Chester A. Congdon, took possession. Q. Prior to that time, do you know whether the lots were vacant? A. They were vacant."

The record proceeds:

"Cross-examination by Mr. Parker: Q. About the time this action was commenced, a fence was built around these lots, was there not, Mr. Congdon? A. Yes, sir. Q. Who built that fence? A. I had it built. In building it I was acting in employ of Chester A. Congdon. Q. Prior to that time—I mean prior to the time you had the fence built—who was in the possession of the lots? A. I suppose Mr. Kraus claimed to be the owner of it. I presume that he was in possession of it. Q. How did you get possession of it? A. By building a fence and putting a man in charge of it, and commencing this action, I suppose, was part of the possession. Q. You built the fence against the objection of Mr. Kraus, did you not, or had it done? A. Yes, sir. Q. He was in possession of the property, and forbid you entering upon the land and building the fence at the time, did he not? A. I was not there at all. I just simply sent a man there, and what conversation Mr. Kraus had with the man I have no knowledge of.

"Redirect examination by Mr. Preble: Q. As a matter of fact, prior to the time that the fence you have referred to around these lots was constructed, there was no fence around them, no structure on them, and no one in the apparent possession of them, was there? A. No."

The county treasurer of Yakima county then testified, in substance, that lot 1 of block 231 was sold by the treasurer of the county on the 18th day of May, 1901, to C. F. Kraus for $68.01, in pursuance of the judgment of foreclosure entered in the suit brought by Kraus, and that subsequent to that sale to him Kraus had paid the taxes upon that lot as follows:

"For the year 1901, the amount of $4.86 was paid by Charles F. Kraus February 8, 1902, receipt No. 159. For the year 1902 the amount paid was $4.66, paid by Charles F. Kraus February 5, 1903, receipt No. 54. For the year 1903, $5.28 was paid by Charles F. Kraus February 2, 1904, receipt No. 32. For the year 1904 the amount was $15.63, paid by Charles Kraus February 28, 1905, receipt No. 837. For the year 1905 the amount was $17.06, paid by Charles Kraus February 5, 1906, receipt No. 15," which amounts included "all sums paid upon said lots in the way of taxes, penalties, interest, and costs or otherwise, according to the books in the treasurer's office by said Charles F. Kraus."

The only other testimony in the case is that of Mr. Preble, whose direct testimony should be, and is, here set out in full:

"My name is E. B. Preble. I reside, and for about nine years last past, have continuously resided at North Yakima, in Yakima county, state of Washington. I am, and for several years last past have been, personally acquainted with the complainant Chester A. Congdon. I am, and since the commencement of this action have been, the solicitor in the said suit of and for the said complainants, Chester A. Congdon, and Clara B. Congdon. I have also acted, since a time prior to the beginning of this suit and to the filing of the bill therein, as the agent or attorney in fact of the said Chester A. Congdon, in respect to lots 1, 2, and 3 in block 231 of and in the city of North Yakima,

in Yakima county, state of Washington, according to the official plat and survey thereof of record in the office of the county auditor for said county. I was so authorized by said Chester A. Congdon some time prior to the middle of February, 1906, some time about the last of January, to act for and in his behalf in respect of the said lots, and I was then instructed by him, as his agent, to take physical and tangible possession of the said lots in his behalf, and I then undertook said employment in his behalf and entered upon the same. Prior to that time—that is, up to and prior to the time that I was so employed by Mr. Congdon, and up to the time that I did, as I propose to hereafter testify, take physical and tangible possession of said lots—the said lots were, and for a long time, and so far as I have known the same, had been, vacant and unoccupied and uninclosed and without fencing, structures, or residence or inhabitance thereon, in short, were vacant and unoccupied at the time that I took physical possession thereof, and for a long time prior thereto had been vacant and unoccupied.

"In pursuance of my employment, and acting for and in behalf of Mr. Congdon as aforesaid, in the month of February, 1906, in behalf of Mr. Chester A. Congdon, I entered upon said lots, the same being one tract of land lying contiguous to each other, the same being, at the time of my entry, vacant and unoccupied and uninclosed; and I forthwith, upon said entry, in conjunction with Albert S. Congdon, caused to be constructed a substantial post and board fence, entirely around and inclosing the said lots, excepting, as I remember now, the east side of the tract consisting of said lots had a fence that served as a partition of these lots and the adjacent tract of land on the east (the fence that I built connected with this line fence, and was supposed to be on the line), and together with it, surrounded the lots; that is to say, I built a fence on the three sides of the lots connecting with a fence that was already existing at or near the east boundary of said lots and separating them from the adjoining tracts. I also, immediately upon my entry, in behalf of Mr. Congdon, caused to be put upon the said tract of land comprising said lots a residence, consisting of a tent erected upon board floors, and caused an employé of Mr. Congdon, employed by me, to immediately go thereon and to reside in the said tent, and at the time this action was commenced, which was on February 17, 1906, and at the time this bill of complaint herein was filed, which was on the date last aforesaid, Mr. Congdon was in the actual, physical possession of the said lots, and all thereof, in the manner aforesaid, said fence then being around the said lots, and said tenant of Mr. Congdon, or employé of him through me, being then living upon the said lot in said tent, and ever since that date—that is, ever since the commencement of this action, and ever since a time prior to the said action, when the said fence was built, and when the said tent was built and the same employé, or tenant as the case might be, moved into said tent—there has been residing upon the said lots, at all times, continuously, some one living in a structure or tent upon said lot, and residing there by the consent of myself, and put thereon by me, acting for and in behalf of Mr. Chester A. Congdon; and I may add that the possession of Mr. Congdon, through me, acting conjointly in part with Albert S. Congdon, has been an exclusive possession and dominion over said lots; that, acting as Mr. Congdon's agent and in pursuance of his instructions, I have frequently, and from time to time since the construction of said fence, and since a time prior to the beginning of this action, been upon said lots, and exercised a general supervision over them for Mr. Congdon. I may say that the people who have resided upon said lots by my permission were different people, but that the residence of one always was immediately succeeded by the residence of another; that in some instances these people were employés of me, acting as the agent of Mr. Congdon; that in other instances they were tenants at will of Mr. Congdon on the property. I may also add that, in addition to the acts of residence upon said property by the consent and by arrangement with Mr. Congdon, acting through me, a Mr. Ludlow, acting in behalf of some religious denomination, was by me permitted to pitch a large tent upon a part of said tract, and to occupy the same, together with the religious congregation, for the holding of divine services.

"I am acquainted with Charles F. Kraus, with Ethel Kraus, and with Ada Maud Kraus, the defendants in this suit. I have been quite familiarly ac-

quainted with Charles F. Kraus for a number of years, from five to seven, or longer, I don't know exactly how many; I have seen and met the wife of Charles F. Kraus, Mrs. Ethel Kraus, and I also have some slight acquaintance with Ada Maud Kraus and have known of her, and known her as Mr. Kraus' daughter, for a number of years, just how long I don't know. She is a young girl, about 15 years old. I think her mother told me that was her age. About a short time before this action was commenced, in February, shortly prior to the commencement of this action—I won't say whether it was on the same day or just a little prior thereto—acting for Mr. C. A. Congdon and in his behalf, I called at the house of Charles F. Kraus where he resided; together with his wife, Ethel Kraus, and his daughter, Ada Maud Kraus, I there met Mrs. Ethel Kraus and Ada Maud Kraus, two of the defendants in this suit. I called for the purpose of tendering to Ada Maud Kraus the moneys that have been paid for the taxes, penalties, interest, and costs upon lot 1 in block 231, and I informed Mrs. Kraus, and also Ada Maud Kraus, that that was my business there. I explained to Ada Maud Kraus (I think her mother was present all or nearly all the time, perhaps not all the time), in detail my business, told her that I was the agent of Chester A. Congdon, and told her that he, Chester A. Congdon, claimed to be the owner of said lot 1 in block 231; called her attention to the fact that it appeared that her father, Charles F. Kraus, had purchased said lot at a tax sale thereof, and called her attention to a further fact that it appeared from the records that her father and mother had, after said tax sale, conveyed the said lot to her, Ada Maud Kraus. I told her that it appeared from the tax records that the aggregate sum paid by her father at the tax sale for the said lot 1, and the taxes subsequently paid by him up to the date of my talk with her, together with all penalties and interest on said sums, amounted, as I figured it, to $140.15. I think I told her that, in fact, it was a little less than that, but that I wanted to be sure to tender her enough to cover said sums. I then produced to her gold coin amounting to $140 and 15 cents in fractional currency. I exhibited this money to her, counted it to her, and without reservation offered to turn it over to her for the purposes aforesaid. She declined to receive it, and did not receive it. I then told her that I had been instructed to commence a suit by Mr. Congdon to establish his title to said lot, together with the other lots, and that I would pay the money that I had just tendered her to the clerk of the Circuit Court of the United States for the Eastern District of Washington, and that she could get it, any time she wanted it, at said clerk's office; and immediately after the tender, or very soon after the tender, I did in fact pay to Mr. Lee C. Delle, who was then and now the deputy clerk of said court for the Southern division, the said $140.15, and paid it to him for Ada Maud Kraus, and instructed him, upon her request or upon the request of any one legally acting in her behalf, to pay the money to her, and the money, as I am informed by the said clerk, Mr. Delle, was kept by him for that purpose, at any rate I know he received it from my hands for that purpose.

"As I stated before, I have been acquainted with the defendant Charles F. Kraus, the father of Ada Maud Kraus, and the husband of the defendant, Ethel Kraus, intimately, for a number of years, and Mr. Kraus and his family, including his said wife and his said daughter, at the time of the commencement of this action, being February 17, 1906, were residing at North Yakima, in Yakima county, state of Washington, and were inhabitants of the Eastern district of the state of Washington—that is, the Eastern judicial district, I mean, of the state of Washington—and Mr. Kraus and his said wife, family, and daughter; for years prior to the commencement of this action, and prior to the date last aforesaid, had continuously resided at said North Yakima, and were inhabitants of the territory comprised in said Eastern judicial district of the state of Washington. I may say that the said $140.15 includes all sums paid by Charles F. Kraus at the tax sale for said lot, and all sums paid subsequently to the said tax sale by him upon said lot 1, and also interest at the legal rate, computed upon said respective sums from the time of said respective payments to the commencement of this action, February 17, 1906, said amounts, upon which the interest was computed, and aggregating the said sum of $140.15, being the sums given by the treasurer, who was a witness in this cause."

On cross-examination Mr. Preble was questioned, and answered as follows:

"Q. Now, you knew at the time you entered upon this land, as you say, in behalf of Mr. Congdon, that she (Ada Maud Kraus) claimed to be the owner of lot 1, did you not? A. Yes, I understood at any rate that she claimed to own that lot. * * * Q. Now, how long did it take you or your employé to build the fence? A. I am unable to say exactly. I presume that from the time I commenced operations of getting the lumber, the posts, and the boards, down there, and hiring the men and getting it all done, the whole thing may have covered a day or two, or, perhaps, three days. Q. How long was it after the posts and lumber were actually on the ground that the fence was built and the tent up? A. I think that the fence was actually up the same day that the lumber was actually on the ground, though I would not swear absolutely positive to that. Q. Then you hired a man to go there and live in the tent in order to hold the semblance of possession of this land? A. No, sir; not the semblance of possession. I employed a man, when the fence was first up, to live there and maintain actual physical possession, and subsequent to that time, I leased it to various persons. * * * Q. Did all these people occupy this lot 1, or were they on another lot? A. They occupied indiscriminately the entire tract. In my contracts with them I gave them the right to occupy, and charged them with the duty of occupancy of the entire tract that was inclosed with that fence. Q. They were there, as a matter of fact, for the purpose of maintaining possession of the land? A. They were there for the purpose of maintaining a physical and tangible possession of said property; and, as Mr. Congdon had instructed me to exercise a dominion over it, his instructions to me were to take the physical possession of that property for him, he claiming to be the owner thereof, to exercise a general supervision over the property in his behalf, to care for it for him, and to keep off intruders, and that was what I was trying to do, and did."

The foregoing embodies the entire substance of the testimony and evidence in respect to the merits as between the complainants and the minor defendant, who is one of the appellants from the decree of the court below quieting the complainants' alleged title to all three of the lots as against all three of the defendants to the suit.

I think it clear that the decree is erroneous in so far as concerns lot 1. In the proof introduced by the complainants on the merits there is not a particle of evidence of any kind or character even tending to show any title in the complainants to the lot covered by the deed to the minor defendant, and under which, according to Preble's own testimony, she claimed title to that lot at the time when (one day only before he instituted the suit) he intruded into its possession to build a fence, which, connecting with a fence already on the lot, effected its inclosure. Nowhere in the proof are the complainants in any manner connected with the title of the original owner or owners of either of the lots in question. Assuming that the tax proceedings alleged in the bill and introduced in evidence were ineffectual to divest the title of the true owner, they, and the deed from Kraus and his wife to the minor defendant, undoubtedly constituted color of title under which the latter claimed and held lot 1 at the time of Preble's unlawful entry upon it in behalf of the complainant Congdon.

It is true that a statute of the state of Washington, as do statutes of many other states, authorizes any person in possession of real property to bring an action against any person or persons claiming an interest in such property, or any part thereof, or any right thereto, adverse to him, for the purpose of determining such adverse claim,

estate, or interest. Section 5521, Ballinger's Ann. Codes & St. Wash. (Pierce's Code, § 1156). But can such an action be maintained in a court of equity upon possession only, where the complainants' own proof shows that such possession was obtained and is held by him as a mere naked trespasser? I think not. I am aware that it was held by the Supreme Court of Nevada, in the case of Scorpion S. M. Co. v. Marsano, 10 Nev. 370, founded upon a similar statute of that state, that the mode of acquiring possession is of no consequence, and that such an action can be maintained upon bare possession, even when the possession was obtained by force; and that in Calderwood v. Brooks, 45 Cal. 519, it was held that a possession obtained by collusion was sufficient to sustain such an action, based upon a similar statute of California. But to the contrary, it was adjudged by the Supreme Court of the United States in the case of Stark v. Starr, 6 Wall. 402, 18 L. Ed. 925, which was a suit in equity, founded upon a similar statute of Oregon, that the possession which will support such a suit "must be accompanied with a claim of right—that is, must be founded upon the title, legal or equitable—and such claim or title must be exhibited with the proofs." To the same effect is King v. French, 2 Sawy. 441, Fed. Cas. No. 7,793, and Tichenor v. Knapp, 6 Or. 205. It is difficult to see how it can be otherwise, for it is surely contrary to the very first principles upon which courts of equity proceed to establish, by a decree of a court of equity, right and title to real property in one whose sole claim thereto rests upon its possession obtained by fraud, collusion, or other wrong.

It is true that the federal courts are bound to enforce rights based upon a state statute in accordance with that law as determined by the highest court of such state; and if the Supreme Court of the state of Washington had decided that a suit to quiet title to real property, founded upon the statute here in question, can be maintained where the complainants' sole claim thereto rests upon possession obtained by an unlawful trespass, fraud, collusion, or other wrong, I should feel obliged to follow it in respect to real property situated within that state; but I do not find any such decision. It is true that in the case of Bird v. Winyer, 24 Wash. 269, 64 Pac. 178, the Supreme Court of the state cited section 5521 of Ballinger's Ann. Codes & St. reading: "Any person in possession * * * of real property * * * may maintain a civil action against any person or persons * * * claiming an interest in such real property or any part thereof or any right thereto adverse to him * * * for the purpose of determining such claim, estate or interest," etc., and said:

"This section, it would seem, needs no argument in support of its construction. There is no requirement here that the plaintiff must have or claim to have title, as in some other states. Under the common-law action to remove clouds, the plaintiff must be in possession, and must have been disturbed in his possession, and he must have established his right by successive judgments in his favor. Allen's Equity, p. 202; Pom. Eq. Juris. § 248; Bispham Eq. (5th Ed.) § 568. The section above quoted, for obvious reasons, has done away with the provisions of the common law, and also in common statutes in other states in the Union has obviated the necessity of alleging and proving title. Any person in possession may maintain the action for the purpose

of quieting his own or his adversary's claim thereto, **so as to avoid any un-**certainty in his holding."

The rule is thoroughly established that the language of a court must be taken and construed in connection with the facts about which the court is speaking. In the case of Bird v. Winyer there was nothing tending to show that the plaintiff acquired the possession of the property there in question by any unlawful or wrongful means; but, on the contrary, the proofs there showed that the plaintiff, who was an Indian, located upon and thereafter continuously possessed and improved the land in question under the terms of a treaty between the United States and the Indian tribe of which he was a member, and under and in pursuance of an allotment made to him of the land under and pursuant to the treaty.

In the later case of Shelton Logging Co. v. Gosser, 26 Wash. 126, 66 Pac. 151, the Supreme Court of Washington distinctly adjudged that, in order for a person successfully to invoke the interposition of equity under the provisions of section 5521 of Ballinger's Ann. Codes & St:

"Two things must be established: (1) The validity of his own title in law or equity; (2) the invalidity of his opponent's. The first inquiry, then, is, has the appellant established any title?" 26 Wash., page 130. 66 Pac., page 153.

In that case the appellant was in the actual possession of the land at the time of commencing the suit, and its proof also showed the basis of its claim of title thereto. The court decided against the validity of that title, saying in its opinion, page 132 of 26 Wash., page 153 of 66 Pac.:

"We understand the rule to be that, in the absence of any showing to the contrary, possession, as a matter of evidence prima facie, establishes title. Horn v. Jones, 28 Cal. 195; McGovern v. Mowry. 91 Cal. 383, 27 Pac. 746; Steele v. Fish, 2 Minn. 153 (Gil. 129); Wilder v. St. Paul, 12 Minn. 192 (Gil. 116). When, however, it is shown, in addition to possession, what the title is under which such possession is claimed, the court is then required to pass upon the question as to whether or not the one so claiming has title, and incidentally as to the lawfulness of his possession. The title claimed by the plaintiff is through a contract with the state. Under it we have held that the appellant had no title to the land within the calls of lot 2. His possession then becomes immaterial as evidence of title. It may be that all the appellant was required to do in order to make out a prima facie case was to establish possession. Here, however, the appellant has gone further than the mere allegation of possession. It has deraigned its title by apt averments, and relies on possession by virtue of the ownership of such title; and from these averments the court is able to determine that it is a mere trespasser on tide land within lot 2, as it has no title to the same. Appellant's title having failed, it is unnecessary to inquire whether or not the respondents had title to any portion, and, if so, what, within the meander lines of said lot 2."

It seems clear to me that the decision of the Supreme Court of Washington last cited is in accord with the decision of the Supreme Court of the United States in Stark v. Starr, supra, and with the view I have taken of the present case. I am also of opinion that the decree appealed from is erroneous as respects the appellants Charles F. Kraus and Ethel Kraus, for the reason that the demurrer to the bill should have been sustained. While it is true that in one part of the bill it is alleged that the judgment, entered in the suit brought by

Charles F. Kraus against W. N. Pratt to foreclose the tax liens, and all proceedings thereunder, were void and of no effect, it also express-ly alleges the validity of the tax assessments against all three of the lots, the validity of a lien on each of them for such taxes, the due is-suance of a certificate of delinquency, under and pursuant to the statutes of the state, covering each of the lots, by virtue of which the county treasurer duly sold at public auction each of the lots to Charles F. Kraus, and thereupon issued to him, pursuant to the provisions of the tax laws of the state, a tax deed, whereby and by the terms of which the county treasurer "granted and conveyed unto said Charles F. Kraus, his heirs and assigns," the lots in question, and that Kraus and his wife subsequently "conveyed" lot 1 to their daughter, Ada Maud Kraus.

The averments of a bill of complaint should be clear, certain, and consistent, and the rule is universal that a pleading is to be taken most strongly against the pleader. While the intention of the pleader in this case may be guessed at, I do not think that a bill, which in one part alleges that certain specified tax proceedings resulted in the conveyance of the title to the property to the purchaser under those proceedings, and in another part alleges that the proceedings were void and of no effect, should be sustained as against a demurrer chal-lenging its sufficiency.

Accordingly, I think the judgment should be reversed, and the case remanded to the court below, with instructions to enter judgment in favor of the defendant, Ada Maud Kraus, as respects lot 1 of block 231, and, as respects the remaining lots in controversy, to sustain the demurrer to the bill, with leave to the complainants to amend.